[No. B160784. Second Dist., Div. Five. July 31, 2003.]

NJD, LTD., Plaintiff and Appellant, v.
THE CITY OF SAN DIMAS et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III (B).

COUNSEL

Newmeyer & Dillion, Karen J. Lee, and Paul L. Starita for Plaintiff and Appellant.

Brown, Winfield & Canzoneri, Vicki E. Land, Mark W. Steres and Tracy M. Noonan for Defendants and Respondents.

## OPINION

### TURNER, P. J.—

## I. INTRODUCTION

NJD, Ltd., plaintiff, appeals from a judgment in favor of the defendants, the City of San Dimas (the city) and its city council. On appeal, plaintiff contends Judge Judith Ashmann-Gerst erroneously denied an in limine motion in connection with a facial regulatory takings challenge to amendments to the city's municipal code which restricted construction in a hillside area. Plaintiff further argues that Judge David P. Yaffe incorrectly denied its mandate petition alleging violations of the California Environmental Quality Act (Pub. Resources Code,[1] § 21000 et seq.). In the published portion of this opinion, we will discuss the issue resolved by Judge Ashmann-Gerst—the evidence she could consider in resolving plaintiff's facial takings challenge to the constitutionality of the city's hillside zoning restrictions. We find no prejudicial error or abuse of discretion. Accordingly, we affirm the judgment.

## II. BACKGROUND

Plaintiff owns approximately 200 acres of land in the city's northern foothills. The foothills area consists of nearly 3,000 acres of land, more than 900 of which are undeveloped and privately owned. The foothills are a sparsely populated area of steep terrain. The fire risk in the area is high. Roughly one-half the foothills area is occupied by the Angeles National Forest, parkland, an equestrian center, and a golf course.

On July 22, 1997, the city instituted a moratorium on development in the northern foothills area. The moratorium was in effect through July 22, 1999. During that time, a consultant under contract with the city studied development of the area and produced a report. An environmental impact report was subsequently prepared. Following public hearings, the city council approved a general plan amendment.[2] The city council also adopted the Northern Foothills Specific Plan, which was included in the San Dimas Municipal Code as

---

[1] Unless otherwise indicated all future statutory references are to the Public Resources Code.

[2] The Land Use Element of the San Dimas General Plan was amended by Resolution No. 99-43 to add the following: "The steepness and visual prominence of the Northern Foothills area create a unique challenge to the management of future development and the protection of the area's sensitive environment. The steep slopes are exposed to the south, southwest, and southeast, and are highly visible through the City of San Dimas and beyond. Of the 33 undeveloped properties within the Northern Foothills area, only two had average slopes less than 30 percent. Even at low, rural densities, significant grading would be required for residences and access roads. Grading at a 2:1 densities or even 1.5:1 slope ratio will result in extended benches before a daylight line can be reached. [¶] In the past, the adopted objectives for hillside residential areas spoke to preservation of the natural landscape, while providing for

Chapter 18.542.[3] The city's actions are referred to collectively as "Amendment 99-1." It is undisputed plaintiff purchased its foothills property while the moratorium was in effect and the development study was ongoing, but before the development restrictions were enacted.

Plaintiff filed a mandate petition alleging California Environmental Quality Act violations. Judge Yaffe denied the petition. The matter was later tried on

rural residential development. The problem is that a policy of preserving the natural landscape could not be literally applied to the Northern Foothills area because any development within the rugged Northern Foothills would result in loss of the natural landscape and habitat. In addition, policies that are appropriate to other hillside areas within San Dimas cannot adequately address the unique needs and challenges of the Northern Foothills planning area. Thus, the General Plan should provide for a specific and separate policy direction for the Northern Foothills. [¶] The guiding principle for managing environmental values and future development within the Northern Foothills area is to protect the area's natural environmental and existing resources, and to ensure that the design/layout of future hillside developments (1) preserve sensitive resources in place, (2) adapt to the natural hillside topography and maximizes view opportunities to, as well as from, the development. Overall, the strategy emphasizes fitting projects into their hillside setting rather than altering the hillside to fit the project. Thus, although individual property rights within the Northern Foothills Area must be recognized, the priority between development and natural resource values should be given to protecting the resource." The Land Use Standards were amended to set forth development feasibility zones and maximum allowable densities. Maximum allowable densities were set forth depending upon location within or outside a development feasibility zone and actual slope, followed by a statement that, "Achievement of the maximum development intensity cited above is not guaranteed; the actual yield of any development is to be determined based upon: [¶]—site-specific physical characteristics; [¶]—the need for mitigation or avoidance of impacts to biological habitats; [¶]—the environmental sensitivity of proposed site design, grading, and type of construction; [¶]—available on-site and off-site access; and [¶]—the ability of the proposed project to avoid impacts on other properties."

[3] The Northern Foothills Specific Plan, San Dimas Municipal Code Chapter 18.542, established "the type, location, intensity and character of development to take place" in the area. The statement of its purpose and intent is as follows: "A. Responsible development of the Northern Foothills of the City can be ensured through the adoption of a development control mechanism that reflects thorough and comprehensive land use planning. The most suitable development control mechanism is the specific plan, which when adopted, serves both a planning function and a regulatory function. [¶] B. The purpose of Specific Plan No. 25 is to provide for managing environmental values and future development within the northern foothills area in order to protect the area's natural environment and existing resources and to ensure that the design of future hillside developments preserves sensitive resources in place, adapts to the natural hillside topography and maximizes view opportunities to, as well as from, the developments. Overall, the strategy emphasizes fitting projects into their hillside setting rather than altering the hillside to fit the project. Thus, although individual property rights within the Northern Foothills Area must be recognized, the priority between development and natural resource values should be given to protecting the natural resource. [¶] C. Specific Plan No. 25 establishes the type, location, intensity and character of development to take place. It functions as a general blueprint of future development, focusing on the physical characteristics of the site and integration of the same with surrounding uses." The Specific Plan sets forth maximum allowable single-family dwelling unit densities consistent with the General Plan.

plaintiff's first amended complaint alleging inverse condemnation, due process and equal protection violations, and seeking declaratory relief. Judge Ashmann-Gerst found plaintiff had not established the elements of its claims. As noted above, plaintiff appeals from the judgment denying its writ petition and finding against it on its first amended complaint.

## III. DISCUSSION

### A. Inverse Condemnation

#### 1. General principles of takings jurisprudence

##### a. The two constitutional provisions

■ The federal and state Constitutions guarantee real property owners "just compensation" when their land is "taken for public use ...." (U.S. Const., 5th Amend.; Cal. Const., art. I, § 19.) The federal takings clause is made applicable to the states through the Fourteenth Amendment. (*Palazzolo v. Rhode Island* (2001) 533 U.S. 606, 617 [150 L.Ed.2d 592, 121 S.Ct. 2448]; *Kavanau v. Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761, 773 [66 Cal.Rptr.2d 672, 941 P.2d 851].) California's takings clause is somewhat broader in its application than its federal counterpart. Article I, section 19 of the California Constitution provides in part, "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." Unlike the Fifth Amendment federal takings clause which provides "nor shall private property be taken for public use, without just compensation," article I, section 19 of the California Constitution provides coverage for "damage[] for public use ...." As a result, article I, section 19 of the California Constitution protects what the California Supreme Court has characterized as " 'a somewhat broader range of property values' " than does the corresponding federal constitutional provision. (*San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643, 664 [117 Cal.Rptr.2d 269, 41 P.3d 87]; *Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 9, fn. 4 [32 Cal.Rptr.2d 244, 876 P.2d 1043].) Aside from that difference, the California Supreme Court has construed the state and federal clauses congruently. (*San Remo Hotel v. City and County of San Francisco, supra*, 27 Cal.4th at p. 664; see *Santa Monica Beach, Ltd. v. Superior Court* (1999) 19 Cal.4th 952, 957, 962–975 [81 Cal.Rptr.2d 93, 968 P.2d 993].)

##### b. The two types of takings—categorical and regulatory

###### i. The United States Supreme Court's analysis

■ The United States Supreme Court has identified two types of takings liability; categorical and regulatory. In *Brown v. Legal Foundation of*

*Wash.* (2003) 538 U.S. 216, 233 [123 S.Ct. 1406, 1417–1418, 155 L.Ed.2d 376], the United States Supreme Court synthesized its prior decisions concerning the two types of takings: " 'Our jurisprudence involving condemnations and physical takings is as old as the Republic and, for the most part, involves the straightforward application of *per se* rules. Our regulatory takings jurisprudence, in contrast, is of more recent vintage and is characterized by "essentially ad hoc, factual inquiries," *Penn Central [Transp. Co. v. City of New York* (1978)] 438 U.S. 104, 124 [57 L.Ed.2d 631, 98 S.Ct. 2646] [] designed to allow "careful examination and weighing of all the relevant circumstances." *Palazzolo [v. Rhode Island, supra,]* 533 U.S. [at p.] 636 (O'Connor, J., concurring).' " (See also *San Remo Hotel v. City and County of San Francisco, supra,* 27 Cal.4th at p. 664.)

As to the first type, categorical takings, which are subject to per se rules, in *Brown,* citing its decision last year in *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency* (2002) 535 U.S. 302, 321–323 [152 L.Ed.2d 517, 122 S.Ct. 1465], the United States Supreme Court held: " 'When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, [citation], regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof. Thus, compensation is mandated when a leasehold is taken and the government occupies the property for its own purposes, even though that use is temporary. [Citations.] Similarly, when the government appropriates part of a rooftop in order to provide cable TV access for apartment tenants [citation]; or when its planes use private airspace to approach a government airport [citation], it is required to pay for that share no matter how small.' " (*Brown v. Legal Foundation of Wash., supra,* 538 U.S. at p. 233–234 [123 S.Ct. at p. 1418]; see *Loewenstein v. City of Lafayette* (2002) 103 Cal.App.4th 718, 728 [127 Cal.Rptr.2d 79].)

In *Brown,* again citing to its analysis in *Tahoe-Sierra Preservation Council,* the United States Supreme Court contrasted the categorical duty to compensate, which is subject to the straightforward application of per se rules, with regulatory takings as follows: " 'But a government regulation that merely prohibits landlords from evicting tenants unwilling to pay a higher rent, [citation]; that bans certain private uses of a portion of an owner's property, [citations]; or that forbids the private use of certain airspace, [citation], does not constitute a categorical taking.' " (*Brown v. Legal Foundation of Wash., supra,* 538 U.S. at p. 234 [123 S.Ct. at p. 1418], citing *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, supra,* 535 U.S. at pp. 321–323.) The United States Supreme Court in *Brown* characterized the differences between the categorical and regulatory takings as follows: " ' "The first category of cases requires courts to apply a clear rule; the second necessarily entails complex factual assessments of the purposes and economic effects of government

actions." [Citations.]' " *(Brown v. Legal Foundation of Wash., supra,* 538 U.S. 216 at p. 234 [123 S.Ct. at p. 1418], citing *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, supra,* 535 U.S. at pp. 321–323.)

In *Palazzolo v. Rhode Island, supra,* 533 U.S. at pages 617–618, the United States Supreme Court identified two regulatory taking situations. The first is where a regulation denies a landowner all economically viable use of the property. The second compensable regulatory taking scenario occurs when a regulation places limitations on land use that fall short of a complete deprivation of all economically beneficial use of the property. In *Palazzolo,* the United States Supreme Court held: "[W]e have given some, but not too specific, guidance to courts confronted with deciding whether a particular government action goes too far and effects a regulatory taking. First, we have observed, with certain qualifications ... that a regulation which 'denies all economically beneficial or productive use of land' will require compensation under the Takings Clause. *Lucas [v. South Carolina Coastal Council* (1992)] 505 U.S. [1003,] 1015 [120 L.Ed.2d 798, 112 S.Ct. 2886] []; see also *id.,* at 1035 (Kennedy, J., concurring); *Agins v. City of Tiburon* [(1980)] 447 U.S. 255, 261 [65 L.Ed.2d 106, 100 S.Ct. 2138] []. Where a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action. *Penn Central [Transp. Co. v. City of New York,] supra,* 438 U.S. at p. 124[]. These inquiries are informed by the purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' *Armstrong v. United States* [(1960)] 364 U.S. 40, 49 [4 L.Ed.2d 1554, 80 S.Ct. 1563]." *(Palazzolo v. Rhode Island, supra,* 533 U.S. at pp. 617–618; accord, *San Remo Hotel v. City and County of San Francisco, supra,* 27 Cal.4th at p. 664.)

The California Supreme Court has described the applicable test for a compensable regulatory taking in a similar vein in *Hensler v. City of Glendale, supra,* 8 Cal.4th at page 10, a case involving an ordinance restricting hillside construction, as follows: " 'But where the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole.' *(Yee v. City of Escondido* (1992) 503 U.S. 519 [118 L.Ed.2d 153, 112 S.Ct. 1522].) An individualized assessment of the impact of the regulation on a particular parcel of property and its relation to a legitimate state interest is necessary in determining

whether a regulatory restriction on property use constitutes a compensable taking. (See, e.g., *Dolan v. Tigard, Ore.* (1994) [512] U.S. [374, 386–391].)"

### ii. The two caveats to the United States Supreme Court analysis

We use the United States Supreme Court categorical—regulatory taking dichotomy with prudence in two respects. First, the categorical duty to compensate arises when, for example, government seizes private property. (*Brown v. Legal Foundation of Wash., supra*, 123 S.Ct. at p. 1418; *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, supra*, 535 U.S. at p. 322.) But in *Lucas v. South Carolina Coastal Council, supra*, 505 U.S. at page 1015, the United States Supreme Court used the term "categorical treatment" to describe a regulation that denied an owner "all economically beneficial or productive use of land." Also, in *Lucas*, the majority noted that the "categorical rule" applied to a "total regulatory taking[]." (*Id.* at p. 1026.) Plaintiff argues that a regulatory taking occurred and relies in large part on *Lucas* in support of its admissibility of evidence contentions. Our analysis assumes a regulatory taking claim has been posited and does so utilizing the dichotomy identified in *Palazzolo v. Rhode Island, supra*, 533 U.S. at page 617, which treats *Lucas* as a regulatory as distinguished from a categorical takings case.

Second, we recognize that there is some decisional inconsistency in the first type of regulatory taking identified in *Palazzolo*. According to *Palazzolo*, the first type of regulatory taking occurs when an enactment " 'denies *all* economically beneficial or productive use of the land ....' " (*Palazzolo v. Rhode Island, supra*, 533 U.S. at p. 617, italics added; see *ante*, at p. 1435.) In *Palazzolo*, as authority for this type of regulatory taking, the majority relied in part on and cited to Justice Lewis Powell's opinion in *Agins v. City of Tiburon, supra*, 447 U.S. at pages 260–261, a facial takings case, where the Supreme Court articulated as the test for a taking in a zoning case the following: "The application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests, see *Nectow v. Cambridge* [(1928)] 277 U.S. 183, 188 [72 L.Ed. 842, 48 S.Ct. 447] [], or *denies an owner economically viable use of his land*, see *Penn Central Transp. Co. v. New York City*, [*supra*,] 438 U.S. [at p. 138, fn. 36]." (Italics added.) In *Palazzolo*, the majority also relied on its prior decision in *Lucas v. South Carolina Coastal Council, supra*, 505 U.S. at pages 1015–1016. In *Lucas*, Justice Antonin Scalia referred in a single paragraph to a regulatory takings claim as "where regulation denies all economically beneficial or productive use of land" and later, citing *Agins v. City of Tiburon, supra*, 447 U.S. at page 261, as when an enactment " '*denies an owner economically viable use of his land.*' " (*Lucas v. South*

*Carolina Coastal Council, supra,* 505 U.S. at pp. 1015–1016.[4]) Quite obviously, in *Agins,* Justice Powell did not state that the loss of "all" "economically viable use of [the] land" was a prerequisite to a regulatory takings claim. (*Agins v. City of Tiburon, supra,* 447 U.S. at p. 261.) But in *Lucas,* the other relevant decision cited in *Palazzolo,* in one sentence, Justice Scalia used the modifier "all" to refer to the required economic deprivation. But in another sentence in the same paragraph, Justice Scalia did not use the modifier "all." (*Lucas v. South Carolina Coastal Council, supra,* 505 U.S. at pp. 1015–1016, italics deleted.) We will apply the modifier "all" to the requisite economic deprivation because it is used in *Palazzolo,* which represents a determination by the United States Supreme Court to bring greater definitional certitude to its takings jurisprudence. Finally, in this case the presence or absence of the modifier "all" is immaterial to the outcome given the circumstances of plaintiff's regulatory facial takings claim.

### c. The two relevant types of challenges to a zoning statute—facial and as applied

■ A landowner may allege a taking based on an inverse condemnation cause of action on either a facial or an as-applied basis. The clearest description of a facial takings challenge by the United States Supreme Court is in *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc., supra,* 452 U.S. at pages 295–296: "Because appellees' taking claim arose in the context of a facial challenge, it presented no concrete controversy concerning either application of the [Surface Mining Control and Reclamation] Act to particular surface mining operations or its effect on specific parcels of land. Thus, the only issue properly before the District Court and, in turn, this Court, is whether the 'mere enactment' of the Surface Mining Act constitutes a taking. [Citation.] The test to be applied in considering this facial challenge is fairly straightforward. A statute regulating the uses that can be made of property effects a taking if it 'denies an owner economically viable use of his land ....' [Citations.]" (See *Keystone Bituminous Coal Ass'n v. DeBenedictis, supra,* 480 U.S. at p. 495.) The "mere enactment" test was described in *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,*

---

[4] The complete paragraph is as follows: "The second situation in which we have found categorical treatment appropriate is where regulation denies all economically beneficial or productive use of land. See *Agins* [*v. City of Tiburon, supra,* 447 U.S. at page] 260 []; see also *Nollan v. California Coastal Comm'n* (1987) 483 U.S. 825, 834 [97 L.Ed.2d 677, 107 S.Ct. 3141] []; *Keystone Bituminous Coal Assn. v. DeBenedictis* [(1987)] 480 U.S. 470, 495 [94 L.Ed.2d 472, 107 S.Ct. 1232] []; *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.* [(1981)] 452 U.S. 264, 295–296 [69 L.Ed.2d 1, 101 S.Ct. 2352][]. As we have said on numerous occasions, the Fifth Amendment is violated when land-use regulation 'does not substantially advance legitimate state interests or *denies an owner economically viable use of his land.' Agins* [*v. City of Tiburon, supra,* 447 U.S. at page] 260 (citations omitted) (emphasis added)." (*Lucas v. South Carolina Coastal Council, supra,* 505 U.S. at pp. 1015–1016, fns. omitted.)

*supra*, 535 U.S. at page 318 like this, "[B]ecause petitioners brought only a facial challenge, the narrow inquiry before the Court of Appeals was whether the mere enactment of the regulations constituted a taking." The United States Supreme Court has observed that a litigant pursuing a facial challenge in a takings case faces an " 'uphill battle.' " (*Suitum v. Tahoe Regional Planning Agency* (1997) 520 U.S. 725, 736, fn. 10 [137 L.Ed.2d 980, 117 S.Ct. 1659]; *Keystone Bituminous Coal Ass'n v. DeBenedictis*, *supra*, 480 U.S. at p. 495.) The Supreme Court has noted, "[I]t is difficult to demonstrate that " 'mere enactment" ' of a piece of legislation 'deprived [the owner] of economically viable use of [his] property.' *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, [*supra*,] 452 U.S. at p. 264, 297 []." (*Suitum v. Tahoe Regional Planning Agency*, *supra*, 520 U.S. at p. 736, fn. 10.)

■ The California Supreme Court has more succinctly differentiated between facial and as-applied challenges as follows: "Generally, '[a] facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual.' (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145] [].) On the other hand, '[a]n as applied challenge may seek ... relief from a specific application of a facially valid statute or ordinance to an individual or class of individuals who are under allegedly impermissible present restraint or disability as a result of the manner or circumstances in which the statute or ordinance has been applied ....' (*Ibid.*)" (*Santa Monica Beach, Ltd. v. Superior Court*, *supra*, 19 Cal.4th at p. 961.)

### 2. Plaintiff's precise contention

The first cause of action in the first amended complaint is entitled, "INVERSE CONDEMNATION-FACIAL TAKING." The first cause of action in the amended complaint alleges: a regulatory taking occurs when a regulation fails to substantially advance a legitimate public purpose or denies a property owner economically viable use of land; Amendment 99-1 failed to advance a legitimate public purpose; the express purpose of Amendment 99-1 was to prevent development; a provision of Amendment 99-1 required property owners to provide access for horse trails without adequate compensation; and the actions of the city amounted to an inequitable precondemnation activity. The first amended complaint alleges that the following provisions of Amendment 99-1 rendered development "economically un feasible": the "maximum densities" allowable under Amendment 99-1 reduced the number of permissible units that could be developed to "an uneconomic level"; the development standards were such that even that "uneconomic level" could not be attained; the lot size standards rendered "development

economically unfeasible"; the clustering of units on less than one acre lots and the construction of sufficiently wide roadways to meet fire department standards prevented the servicing of "homes with sewers and [spreading] the costs of roads and other proper municipal services over sufficient units to create an economic development"; the requirement that homes be one story in height increased the need for grading; the grading requirements and other standards assured that the homes would be of low square footage thereby rendering development of marketable residences uneconomic; there was no variance procedure to escape application of the standards because they are part of the city's general and specific plan; and there is no economically viable agricultural or other use. Plaintiff alleges that Amendment 99-1 thereby denied it "all economically viable use of the[] property," which constituted a de facto taking without just compensation.

Prior to the trial before Judge Ashmann-Gerst, defendants filed an in limine motion which sought the following, "[D]efendants ... hereby move ... for an order in limine excluding any and all evidence, reference to evidence, testimony or argument other than Amendment 99-1 itself, relevant evidence in the administrative record of that legislation, and judicially noticeable facts regarding the physical condition of the properties ... in support of plaintiff['s] claim contained within its First Cause of Action for Facial Taking that Amendment 99-1 deprives it of economically viable use of its property." Judge Ashmann-Gerst granted the in limine motion.

On appeal, plaintiff contends that Judge Ashmann-Gerst erroneously granted the in limine motion. Plaintiff argues that economic impact evidence is an essential component of a facial challenge in a takings case. Plaintiff's principal authority consists of two quotations in the United States Supreme Court decision in *Lucas v. South Carolina Coastal Council, supra,* 505 U.S. at pages 1018 and 1016, footnote 6. The first quotation relied upon by plaintiff from *Lucas* is as follows, "[R]egulations that leave the owner of land without economically beneficial or productive options for its use—typically, as here, by requiring land to be left substantially in its natural state—carry with them a heightened risk that private property is being pressed into some form of public service under the guise of mitigating serious harm." (*Id.* at p. 1018.)

Additionally, plaintiff relies upon a footnote in *Lucas,* which is a response by the majority to analysis appearing in a footnote in the dissenting opinion of Justice Harry Blackmun.[5] In response to Justice Blackmun's analysis, the majority argued in its own footnote, the following

---

[5] The footnote in Justice Blackmun's dissenting opinion which prompted the majority analysis discussed in the body of this opinion was as follows: "The Court's suggestion that *Agins v. City of Tiburon,* [*supra,*] 447 U.S. 255, 65 L.Ed.2d 106, 100 S.Ct. 2138 [], a unanimous opinion, created a new *per se* rule, only now discovered, is unpersuasive. In *Agins,* the Court stated that 'no precise rule determines when property has been taken' but instead that 'the question necessarily requires a weighing of public and private interest.' *Id.,* at 260–262 [].

italicized portions upon which plaintiff relies: "We will not attempt to respond to all of Justice Blackmun's mistaken citation of case precedent. Characteristic of its nature is his assertion that the cases we discuss here stand merely for the proposition 'that proof that a regulation does *not* deny an owner economic use of his property is sufficient to defeat a facial takings challenge' and not for the point that '*denial* of such use is sufficient to establish a takings claim regardless of any other consideration.' *Post,* at 2911, n. 11. [¶] The cases say, repeatedly and unmistakably, that " '[t]he test to be applied in considering [a] facial [takings] challenge is fairly straightforward. *A statute regulating the uses that can be made of property effects a taking if it 'denies an owner economically viable use of his land.*" ' " *Keystone [Bituminous Coal Assn. v. DeBenedictis*[, *supra,*] 480 U.S. 470,] 495 [94 L.Ed.2d 472, 107 S.Ct. 1232], quoting *Hodel [v. Virginia Surface Mining & Reclamation Assn., Inc.,* [*supra,* 452 U.S. at pp.] 295–296 [] (quoting *Agins [v. City of Tiburon, supra,]* 447 U.S. at 261 [] (emphasis added). [¶] Justice Blackmun describes that rule (which we do not invent but merely apply today) as 'alter[ing] the long-settled rules of review' by foisting on the State 'the burden of showing [its] regulation is not a taking.' *Post,* at 2909. This is of course wrong. Lucas had to do more than simply file a lawsuit to establish his constitutional entitlement; *he had to show that the Beachfront Management Act denied him economically beneficial use of his land.* Our analysis presumes the unconstitutionality of state land-use regulation only in the sense that *any* rule with exceptions presumes the invalidity of a law that violates it—for example, the rule generally prohibiting content-based restrictions on speech. See, e.g., *Simon & Schuster, Inc. v. N.Y. Members of State Crime Victims Bd.,* 502 U.S. 105, 115 [116 L.Ed.2d 476, 112 S.Ct. 501] [] (1991) ('A statute is presumptively inconsistent with the First Amendment if it

---

The other cases cited by the Court, *ante,* at 1015, repeat the *Agins* sentence, but in no way suggest that the public interest is irrelevant if total value has been taken. The Court has indicated that proof that a regulation does *not* deny an owner economic use of his property is sufficient to defeat a facial takings challenge. See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* [*supra,*] 452 U.S. [at pp. 295–297]. But the conclusion that a regulation is not on its face a taking because it allows the landowner some economic use of property is a far cry from the proposition that *denial* of such use is sufficient to establish a takings claim regardless of any other consideration. The Court never has accepted the latter proposition. [¶] The Court relies today on dicta in *Agins, Hodel, Nollan v. California Coastal Comm'n,* [*supra,*] 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141] [], and *Keystone Bituminous Coal Assn. v. DeBenedictis,* [*supra,*], 480 U.S. 470 [94 L.Ed.2d 472, 107 S.Ct. 1232], for its new categorical rule. *Ante,* at 1015. I prefer to rely on the directly contrary holdings in cases such as [*Hadacheck] v. Sebastian,* 239 U.S. 394 [60 L.Ed. 348, 36 S.Ct. 143] [] (1915), and [*Mugler] v. Kansas,* 123 U.S. 623 [31 L.Ed. 205, 8 S.Ct. 273] [] (1887), not to mention contrary statements in the very cases on which the Court relies. See *Agins,* 447 U.S., at 260–262 []; *Keystone Bituminous Coal [Assn. v. DeBenedictis, supra],* 480 U.S., at 489, n. 18. []" *(Lucas v. South Carolina Coastal Council, supra,* 505 U.S. at pp. 1049–1050, fn. 11 (dis. opn. of Blackmun, J.).)

imposes a financial burden on speakers because of the content of their speech'). Justice Blackmun's real quarrel is with the substantive standard of liability we apply in this case, a long-established standard we see no need to repudiate." (*Lucas v. South Carolina Coastal Council, supra*, 505 U.S. at p. 1016, fn. 6, orig. italics.) Based on the foregoing dictum, a portion of it arising in the context of an inter-court debate in footnotes in *Lucas*, plaintiff argues that as part of its facial challenge to Amendment 99-1 it had a duty and the corresponding right to present evidence as to the lack of any economically viable use of its hillside property.

On appeal, plaintiff argues it should have been permitted to present evidence that as a consequence of the adoption of Amendment 99-1, its hillside property lost "all economic viability under private ownership." Plaintiff asserts the reasons its hillside property had lost all economic viability because of the adoption of Amendment 99-1 were as follows: the diminution in the number of residential units that could be built; a reduction in the potential revenue that would be derived from the sale of single family homes; an increase in the land development expenditures expressed on a cost per unit basis; the permitted densities of either 20 or 5 dwelling units resulted in insufficient cash flow to compensate the developer for investment and risks associated with development; and the permitted densities of either 20 or 5 dwelling units failed to provide for an adequate "return on the initial land investment."

### 3. The takings issue posited by plaintiff and the standard of review

■ It is crucial to identify the two components of the precise challenge before us. Plaintiff is making a *facial* challenge to Amendment 99-1. As such, the legal issue plaintiff presents is what the United States Supreme Court characterized as "whether the 'mere enactment' " of Amendment 99-1 consti-tutes a taking, i.e., denies the " 'owner economically viable use' " of the hillside property. (*Keystone Bituminous Coal Assn. v. DeBenedictis, supra*, 480 U.S. at p. 495; *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc., supra*, 452 U.S. at pp., 295–296.) Plaintiff is further contending that a regulatory rather than a categorical taking has occurred. The regulatory taking is of the first type identified in *Palazzolo*; Amendment 99-1 has deprived plaintiff of "all economically beneficial or productive use" of its hillside property. (*Palazzolo v. Rhode Island, supra*, 533 U.S. at p. 617.) Therefore, the issue before Judge Ashmann-Gerst was whether the facial challenge warranted the presentation of the aforementioned evidence to prove that Amendment 99-1 deprived plaintiff of all " 'economically beneficial or productive use' " of its hillside property. (*Ibid.*) In assessing plaintiff's evidentiary admissibility contentions on appeal, we apply the deferential

abuse of discretion standard of review. (*Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1078 [124 Cal.Rptr.2d 142, 52 P.3d 79]; *People v. Alvarez* (1996) 14 Cal.4th 155, 203 [58 Cal.Rptr.2d 385, 926 P.2d 365].)

>    4.   Judge Ashmann-Gerst did not abuse her discretion in
>          denying plaintiff's motion to present the proffered
>          evidence in support of its facial challenge to
>          Amendment 99-1

We agree with defendants that Amendment 99-1 provided economically beneficial uses as well as discretionary procedures to mitigate any unfairness in its application. Among other things, Amendment 99-1 permits: single-family residences; equestrian uses; and commercial communications facilities (San Dimas Mun. Code,[6] § 18.542.120); public utility facilities (Mun. Code, § 18.542.140),[7] the construction of one residential structure on every 5 to 80 acres depending on the status of the natural slope of the hillside (Mun. Code, § 18.542.110);[8] and the construction of at least one dwelling unit on each

---

[6] All citations to the municipal code are to the San Dimas Municipal Code as found at http://municipalcodes.lexisnexis.com/ codes/sandimas/ (as of July 31, 2003).

Municipal Code section 18.542.120 refers to "Permitted land uses" and states, "Primary uses in Specific Plan No. 25 are as follows: [¶] A. Detached single-family residential; [¶] B. Grazing; [¶] C. Public parks and open space; [¶] D. Public and private trails; [¶] E. Public and/or quasi-public utility transmission, communication and/or service facilities, provided that the proposed facility shall be located a minimum of three hundred feet from the nearest residence and not exceed twenty-five feet in height."

Municipal Code section 18.542.130 provides for conditional uses as follows: "A. Wireless communications facilities, in accordance with Section 18.150.070(B). [¶] B. Equestrian facilities, including horse boarding." (See also San Dimas Mun. Code, §§ 18.542.380 [horses may be quartered and maintained], 18.542.390 [equestrian trails].)

Municipal Code section 18.150.010 states, "It is the desire of the city to encourage an aesthetically pleasing local environment. It is also the intent of the city to encourage the expansion of wireless technology because it provides a valuable service to residents and business persons in the city. It is the city's goal to encourage wireless providers to construct new facilities disguised as public art pieces or to mount antennae on buildings in a way that blends architecturally with the built environment."

[7] Municipal Code section 18.542.140 states in part, "Accessory uses in Specific Plan No. 25 are as follows: [¶] ... [¶] E. Public utility facilities, as approved by the director of planning ...."

[8] Municipal Code section 18.542.110 sets the maximum allowable density for new development at one dwelling unit per 5 to 80 acres depending on the natural slope of the land. Pursuant to Municipal Code section 18.542.050(B), " 'Natural slope' means the vertical change in elevation over a given horizontal distance prior to grading or any alteration." " 'Average slope,' " on the other hand, "means the average slope in a given geographical area as determined according to [a specified formula]." (San Dimas Mun. Code, § 18.542.050(A).) Municipal Code section 18.542.110(B) states, "Achievement of the maximum development intensity cited above is not guaranteed; the actual yield of any development is to be determined based upon: [¶] 1. Site-specific physical characteristics; [¶] 2. The need for mitigation or

existing lot regardless of the density limitations established under the slope analysis (Mun. Code, § 18.542.110(D)).[9]

Further, the variance procedures set forth in the city's municipal code were available to ameliorate any harshness imposed by the hillside property development limitations. Municipal Code section 18.204.010 states: "When practical difficulties, unnecessary hardships, or results inconsistent with the general intent and purpose of this title occur by reason of the strict interpretation of any of its provisions, any property owner may initiate proceedings for consideration of a variance from the provisions of this title. [¶] A variance will not be granted to permit a land use expressly prohibited in the zone in which the property is located." No doubt, as plaintiff argues, the variance procedure cannot be utilized to modify requirements imposed by the city's general plan. (See *deBottari v. City Council* (1985) 171 Cal.App.3d 1204, 1211–1212 [217 Cal.Rptr. 790]; Gov. Code, § 65860, subd. (a) ["[C]ity zoning ordinances shall be consistent with the general plan of the ... city ..."].) But because Amendment 99-1 is part of the city's Municipal Code, the variance provisions of chapter 18.204 set forth above allow for amelioration of any of its unduly harsh provisions. Moreover, Amendment 99-1 allows for some very limited discretion in connection with: grading (Mun. Code, § 18.542.230(D);[10] setbacks (Mun. Code, § 18.542.260);[11] lot and site design

---

avoidance of impacts to biological habitats; [¶] 3. The environmental sensitivity of proposed site design, grading and type of construction; [¶] 4. Available on-site and off-site access and circulation; and [¶] 5. The ability of the proposed project to avoid impacts on other properties."

[9] Municipal Code section 18.542.110(D) provides, "Within the Specific Plan No. 25 area, there are existing lots of record that exceed the maximum development densities cited above. For these parcels, one single-family dwelling unit may be permitted without compliance with maximum allowable density and minimum lot size but subject to all other regulations and requirements of this specific plan."

[10] Municipal Code section 18.542.230(D) provides, "Grading is permitted under the following guidelines: [¶] ... [¶] 3. The extent of visible exposed cut or fill banks shall be limited to twelve feet except where the use of a specific grading technique minimizes the visual impact or aids in visual screening. [¶] 4. Significant landmark features as determined by the planning division, such as prominent trees and areas of special natural beauty, shall be preserved ...."

[11] Setbacks are governed by Municipal Code section 18.542.260, which provides as follows: "A. Front Yard Setbacks. Front yard setbacks shall be a minimum of fifty feet but a lesser minimum setback may be reviewed and approved by the development plan review board if warranted by topographic conditions or to otherwise comply with the intent of standards set forth in this specific plan. [¶] B. Side Yard Setbacks. Side yard setbacks shall be a minimum of forty feet but a lesser minimum setback may be reviewed and approved by the development plan review board if warranted by topographic conditions or to otherwise comply with the intent of standards set forth in this specific plan. [¶] C. Setbacks for Accessory Structures. Setbacks for accessory structures shall be as established by the development plan review board, but no less than forty feet to the side or rear yard property line but a lesser minimum setback may be reviewed and approved by the development plan review board if warranted by

(Mun. Code, § 18.542.270);[12] adjustment of driveways and roadways (Mun. Code, §§ 18.542.280, 18.542.290);[13] placement of utilities (Mun. Code,

topographic conditions or to otherwise comply with the intent of standards set forth in this specific plan."

[12] Municipal Code section 18.542.270 governs lot and site design. It states, "All site plans shall be in compliance with the following standards: [¶] A. New development shall be designed to fit into the natural character of the area rather than relying on substantial landform modification to create artificial building pads. [¶] B. The visual intrusiveness of new development shall be minimized. [¶] C. Site design shall utilize varying setbacks, structure heights, innovative building techniques, and retaining walls to blend structures into the terrain. [¶] D. Lot and site design shall consider building separation to maintain a rural character and to facilitate privacy between residential structures. [¶] E. Site design shall allow for different lot shapes and sizes, as well as the provision of split development pads, with the prime determinant being the natural terrain. [¶] F. Houses shall not be excessively tall so as to dominate their surroundings. Structures shall be a maximum of one story in height, but may be constructed on split, flat pads contained within a limited envelope parallel to the finished grade, rather than 'jutting out' over natural slopes. [¶] G. Flag lots shall be allowed in areas where it is demonstrated that the end result is the preservation of natural topography by minimizing grading. [¶] H. Structures shall be sited in a manner that will fit into the hillside's contour and relate to the form of the terrain; retain outward views while maintaining the natural character of the hillside; preserve vistas of natural hillside areas and ridgelines from public places and streets; preserve existing views; and, allow new dwellings access to views similar to those enjoyed from existing dwellings ...."

[13] Municipal Code section 18.542.280 provides, "In addition to the standards established by Chapter 18.156 [vehicle parking and storage], the following standards will apply: [¶] A. General. Driveways and drives shall be designed to a grade and alignment that will provide the maximum of safety and convenience for vehicular, emergency and pedestrian use and in a manner which will not interfere with drainage or public use of the street areas. Driveways shall be located and designed to minimize disturbance to natural terrain. [¶] B. A minimum of two off-street parking spaces within a fully enclosed garage shall be provided for each dwelling unit. In addition, four off-street parking spaces for guests shall be provided for each dwelling unit. Off-street guest parking may be reduced where it is found that sufficient on-street parking is available or excessive grading would be necessary to create the off-street guest parking. [¶] C. Driveways shall have a minimum width of sixteen feet, unless modified to preserve natural terrain pursuant to the plan disposition procedure. [¶] D. The occasional use of common driveways serving two or more residences can drastically reduce the potential monotonous repetition of driveways as well as reduce grading and the on-site costs of development. Driveways which serve more than one lot, as well as diagonal driveways running along contour lines, are encouraged as a means of reducing unnecessary grading, paving and site disturbance. These arrangements shall be encouraged ...."

Pursuant to Municipal Code section 18.542.290, governing access and circulation, "Plans delineating access to the subject site and area[]wide circulation shall be required and shall be in compliance with the following standards: [¶] A. Street Design Standards. Street designs shall comply with the following standards: [¶] 1. Roadways within Specific Plan No. 25 shall provide for minimum safe passage of two cars along a paved road section, except in limited circumstances and as approved by the planning director and city engineer. [¶] 2. Street widths shall conform to the following minimum street sections. On-street parking shall be prohibited unless deemed safe or unless parking turn-outs are provided. [¶] 3. Streets shall follow the natural contours of the hillside to minimize cut and fill .... [¶] 4. Streets may be split into two, parallel one-way streets, thereby effectively functioning as a two-way street with a median, in steeper areas to minimize grading and blend with the terrain .... [¶] 5. Cul-de-sacs or loop

§ 18.542.320);[14] and the like. Additionally, Amendment 99-1 vests the city's planning director with authority to make minor modifications to the specific

roads are encouraged where necessary to fit the terrain. [¶] 6. On-street parking and sidewalks may be eliminated, subject to city approval, to reduce required grading. [¶] B. Roadway Curve and Grade Standards. Roadway grades and curves should accommodate safety and emergency vehicles. [¶] 1. Existing roadway grade standards shall be applied to all proposed subdivisions and parcel maps. However, the planning director and city engineer may grant exceptions to existing roadway standards for grades and curves where, in their judgment, existing or future access cannot reasonably meet such standards. These exceptions are to be limited to providing access to a single-family dwelling on an existing lot of record along roadways which will ultimately serve a maximum of four dwellings, based on the maximum allowable density in the General Plan, and where not providing such an exception would effectively preclude access to an existing lot of record. [¶] 2. Where the planning director and city engineer grant an exception to roadway grade standards, owners whose land is served by such a roadway will be required to provide adequate assurance that the roadway will be kept properly maintained at all times. In addition, such landowners will be required to record a deed restriction which prohibits further subdivision of the property without meeting roadway grade standards and provides an acknowledgment of this special circumstance. Such owners will also be required to indemnify the city or any other service provider against any liability regarding emergency or nonemergency vehicle access. [¶] C. Circulation Standards. Roadway improvements to provide access to parcels shall not adversely affect other properties through extensive grading, flood control facilities, or any other type of construction and/or requisite support infrastructure. [¶] D. Reductions in Minimum Roadway Standards. In conjunction with the review of a development proposal, consideration may be given to reducing certain specified roadway standards pursuant to the following: [¶] 1. Within the upper elevations of the northern foothills area, a further reduction in required roadway width may be permitted for private roadways which will ultimately serve a maximum of four dwellings, based on the maximum allowable density permitted by the General Plan, and where not providing such a reduction would effectively preclude access to an existing lot of record. For such roadways, roadway standards may permit a curb-to-curb width which does not allow for passage of two vehicles (minimum sixteen feet, measured edge-to-edge) for a distance of up to one hundred fifty feet in any one segment. [¶] a. Where such a reduction in roadway width is permitted, owners whose land is served by such a roadway shall be required to provide adequate assurance that the roadway will be kept properly maintained at all times. In addition, such landowners will be required to record a deed restriction which prohibits further subdivision of the property without meeting roadway width requirements, and provides an acknowledgment of this special circumstance. Such owners will also be required to indemnify the city or any other service provider against any liability regarding emergency or nonemergency vehicle access. [¶] 2. An exception to current city roadway requirements for street paving may be permitted along private roadways which will ultimately serve a maximum of four dwellings, based on the maximum density allowable in the General Plan. Such limited use roadways should be permitted to be hard packed (e.g., decomposed granite) as approved by the planning director and city engineer, provided that adequate maintenance is guaranteed to ensure that the roadway will be regularly graded and kept clear of ruts and debris. [¶] a. Where such an unpaved roadway is permitted, owners whose land is served by such a roadway shall be required to provide adequate assurance that the roadway will be kept properly maintained at all times. In addition, such landowners will be required to record a deed restriction which prohibits further subdivision of the property without providing required paving, and provides an acknowledgment of this special circumstance. Such owners will also be required to indemnify the city or any other service provider against any liability regarding emergency or nonemergency vehicle access."

[14] Placement of overhead utilities is governed by Municipal Code section 18.542.320, which provides, "Overhead utilities may be permitted and shall comply with the following standards.

plan.[15] Hence, defendants argue that, *on its face,* Amendment 99-1 does not constitute a regulatory taking depriving plaintiff of all economically viable use of its hillside property.

In response to defendants' foregoing analysis, the only controlling authority cited by plaintiff is *Lucas v. South Carolina Coastal Council, supra,* 505 U.S. at page 1016, footnote 6, discussed above. (See *ante,* at pp. 1440–1441.) Initially, it should be noted that the language relied upon by plaintiff does not discuss the issue of admissibility of evidence in a facial challenge to regulatory taking. The United States Supreme Court has repeatedly emphasized that its decisions are not controlling authority for propositions not considered by it in the case. (*Landgraf v. USI Film Products* (1994) 511 U.S. 244, 265 [128 L.Ed.2d 229, 114 S.Ct. 1483] ["[T]he 'maxim not to be disregarded that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used' "]; *R.A.V. v. City of St. Paul, Minn.* (1992) 505 U.S. 377, 386–387, fn. 5 [120 L.Ed.2d 305, 112 S.Ct. 2538] [it is "contrary to all traditions of our jurisprudence to consider the law on this point conclusively resolved by broad language in cases where the issue was not presented or even envisioned"]; *U.S. v. Stanley* (1987) 483 U.S. 669, 680 [97 L.Ed.2d 550, 107 S.Ct. 3054] ["no holding can be broader than the facts before the court"].) The issue before us was not before the United States Supreme Court in *Lucas*—hence, it is not the controlling authority plaintiff claims it is.

Most importantly though, *Lucas* is materially factually different from the present case. In *Lucas,* the regulation at issue prohibited the building of any inhabitable structure on the property. Justice Scalia described the factual and legal issue in *Lucas* as follows: "In 1986, petitioner David H.

---

[¶] A. Overhead utilities (e.g., electrical, telephone, etc.) should only be permitted within the right-of-way of roadways connecting development areas; to serve development of a single dwelling unit on an existing lot of record; and within the rights-of-way of roadways where all lots are five acres in size or greater. [¶] B. In cases where aboveground utilities are permitted within the right-of-way of a roadway, connections to individual dwellings shall be underground. Utilities shall continue to be underground within subdivisions and parcel maps along roadways serving parcels smaller than five acres, as currently required. Where overhead utilities are permitted, their adverse visual impact on surrounding properties is to be mitigated through sensitive placement. [¶] C. Clear cutting of vegetation for an overhead utility corridor shall not be permitted. [¶] D. Plans shall indicate location of utilities and utility easements serving or intending to serve the proposed structures. The approvals may require or otherwise facilitate the appropriate sizing of utilities to serve other parcels in the area and the provision of access to those utilities by the same parcels."

[15] Municipal Code section 18.542.040(E), which is part of Amendment 99-1 and the city's municipal code, states, "Minor modifications to the specific plan, which do not give rise to a conflict with the intent of the specific plan as approved, may be approved by the director of planning at his discretion."

Lucas paid $975,000 for two residential lots on the Isle of Palms in Charleston County, South Carolina, on which he intended to build single-family homes. In 1988, however, the South Carolina Legislature enacted the Beachfront Management Act ... which had the direct effect of barring petitioner from erecting any permanent habitable structures on his two parcels. [] A state trial court found that this prohibition rendered Lucas's parcels 'valueless.' " (*Lucas v. South Carolina, supra*, 505 U.S. at pp. 1006–1007.) Later, Justice Scalia described the effect of the land use regulation at issue: "[U]nder the [Beachfront Management] Act construction of occupiable improvements was flatly prohibited [on Mr. Lucas's property]. The [Beachfront Management] Act provided no exceptions." (*Id.* at pp. 1008–1009.) The South Carolina Beachfront Management Act, which on its face accomplished a regulatory taking, is materially different from San Dimas's Amendment 99-1 with its exceptions and the availability of the safeguard of the variance procedure.

Further, Judge Ashmann-Gerst, without abusing her discretion, could find the evidence plaintiff proffered irrelevant to a facial challenge.  ■  In *Keystone Bituminous Coal Assn. v. DeBenedictis, supra*, 480 U.S. at page 494, Justice John Paul Stevens explained the precise nature of a takings challenge, a facial as distinguished from an as-applied claim, is critical to assessing takings litigation. Justice Stevens wrote: "The posture of the case is critical because we have recognized an important distinction between a claim that the mere enactment of a statute constitutes a taking and a claim that the particular impact of government action on a specific piece of property requires the payment of just compensation." (*Ibid.*) As already noted, in both *Hodel* and *Keystone*, the United States Supreme Court explained that: there is no set formula for assessing a regulatory taking; in the regulatory taking context, " 'These "ad hoc, factual inquiries" must be conducted' " by a court; in a facial challenge in the regulatory takings context, the issue is whether the "mere enactment" of the statute is at issue; and a facial challenge presents no " 'concrete controversy' " as to the application of the statute to the property at issue. (*Id.* at pp. 494–495; *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc., supra*, 452 U.S. at p. 295–296.) The "mere enactment" language that defines the nature of a facial challenge also appears in *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, supra*, 535 U.S. at page 318. All of plaintiff's proffered evidence related to the application of Amendment 99-1 to the profitable development of its hillside property. Thus, without abusing her discretion, Judge Ashmann-Gerst could conclude that plaintiff's proffered evidence was irrelevant to its facial challenge.

Three other points are pertinent to plaintiff's takings claim. First, we are not holding that no evidence may be received in a facial regulatory takings case. In this case, Judge Ashmann-Gerst had an extensive array of evidence

before her concerning Amendment 99-1 including the administrative record. There was no issue as to the extent of Amendment 99-1 and its exceptions. There was no dispute as to plaintiff's standing to bring suit. By contrast for example, in *Lucas*, the plaintiff had a duty to demonstrate his parcel was subject to the South Carolina's Beachfront Management Act. Certainly, a party has a right to present relevant evidence. But the amount and type of admissible evidence depends on the type of takings challenge; be it categorical or regulatory, facial or as-applied. Of course on appeal, these matters are reviewed for an abuse of discretion. Second, plaintiff does not assert the second type of regulatory taking described in *Palazzolo* has occurred; viz. when the regulatory action has not eliminated all economically beneficial uses but a taking depends on a "complex of factors" including the economic effect, the extent of interference with the owner's reasonable investment-backed expectations, and the character of the government action. (*Palazzolo v. Rhode Island, supra,* 533 U.S. at pp. 617–618, citing *Penn Central Transp. Co. v. City of New York, supra,* 438 U.S. at p. 124; see *Kavanau v. Santa Monica Rent Control Bd., supra,* 16 Cal.4th at p. 775.) We need not resolve whether a facial claim can be pursued in the context of this second type of regulatory takings case. Given our discussion, we need not address the other contentions posited by the parties.

Third, plaintiff contends the only way to make development economically feasible would be to substantially increase allowable density; moreover, because both the general and specific plans set forth maximum density, a legislative amendment of the general plan and adoption of a new specific plan would be required. Therefore, plaintiff reasons, the availability of variance procedures applicable to the specific plan but not to the general plan (Mun. Code, § 18.204.010 et seq.) is immaterial. As discussed above, whether there is no economically viable use of plaintiff's property absent a change in the allowable density is a question that exceeds the reach of a facial challenge to Amendment 99-1. It presents a concrete controversy as to the application of the zoning restrictions to plaintiff's particular property. Plaintiff's argument with respect to the restrictions set forth in the general plan does not render its facial challenge viable.

B.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 1428.

## IV.   DISPOSITION

The judgment is affirmed. Defendants, the City of San Dimas and the City Council of the City of San Dimas, are to recover their costs on appeal from plaintiff, NJD, Ltd.

Armstrong, J., and Mosk, J., concurred.

A petition for a rehearing denied August 18, 2003, and appellant's petition for review by the Supreme Court was denied November 12, 2003.