2006 UT 9

**UTAH PUBLIC EMPLOYEES ASSOCIATION and Roes 1 through 5, Plaintiffs and Petitioners,**

v.

**STATE of Utah, Defendant and Respondent.**

**No. 20051121.**

Supreme Court of Utah.

Feb. 16, 2006.

Benson L. Hathaway, Alexander Dushku, Matthew K. Richards, Stephen W. Geary, Salt Lake City, for plaintiffs.

Clark Waddoups, Heidi E. Leithead, David C. Reymann, Cheylynn Hayman, Salt Lake City, for defendant.

Petition for Emergency Relief

WILKINS, Associate Chief Justice:

¶ 1 In its 2005 session, the Utah Legislature passed House Bill 213 (H.B.213), known as the "Unused Sick Leave at Retirement Amendments." Although the Legislature set the bill's effective date as January 1, 2006, we, at the request of Petitioners, postponed the effective date of the amendments to allow review of the constitutional issues presented in this case. The Utah Public Employees Association (UPEA) and Roes 1 through 5 have asked us, on expedited review, to consider whether the provisions of H.B. 213 result in an unconstitutional taking of state employees' vested property rights. We conclude that they do not.

## BACKGROUND

### I. FACTUAL BACKGROUND

¶ 2 For more than 25 years, the State has permitted its agencies to adopt an incentive program intended to both reduce the misuse of sick leave and to induce persons to work for the State in spite of generally better private-sector wages and benefits. This program originated in 1979 and has been subject to periodic legislative change since its inception. The program is currently titled the "Unused Sick Leave Retirement Option Program" (the Program), and is found in Utah Code section 67–19–14.2. Plaintiffs contend that the 2005 amendments to the Program,

contained in H.B. 213, effect an unconstitutional taking of employees' unused sick leave benefits by retroactively devaluing already vested rights. The State counters that no rights vest until the date of actual retirement, and therefore the employees lack a constitutionally protected property interest in those unused sick leave hours.

### A. Statutory History of Utah Code section 67–19–14.2

¶ 3 Our extensive research led to the discovery that by statute, the Legislature has occasionally changed the menu of benefits that could be acquired upon retirement in exchange for accrued and unused sick leave over the past 25 years, and that the Legislature has imposed varied restrictions on how those hours may be redeemed. We requested additional briefing on this statutory history because in their original briefs on appeal, both parties misstated the statutory history.

¶ 4 The most cursory reading of the statutory history discloses that since 1979 the Legislature has empowered state agencies to permit their respective employees to participate in some form of unused sick leave trade-in program. At its inception, the program permitted employees to "at the time of retirement" convert unused sick leave hours "into paid-up health and medical insurance."[1] Under this iteration of the statute, an employee could convert 100% of accrued sick

leave hours into post-retirement health and medical insurance.[2]

¶ 5 Beginning in 1983, however, the Legislature changed the language of the statute to require employees to accept a cash pay-out for 25% of the accrued sick leave and medical and life insurance for the remaining 75%.[3] This distinction between the sanctioned use of the 25% versus the 75% remained in effect until 1998 when the Legislature changed the statutory scheme again to permit an employee to apply 25% to either a cash-payout or a 401(k) contribution.[4] Then in 2004, legislative modifications again allowed, but did not require, use of the entire 100% for medical and life insurance benefits.[5]

¶ 6 Due to the perceived desirability of the offered incentives, most state agencies have chosen to extend the offer to their employees, and many state employees have accordingly reserved unused sick leave for the purposes permitted by the Program. Participating State employees accrue sick leave hours at the rate of four hours per two-week pay period, and many have reserved, or "banked," a significant number of unused sick leave hours. As the Program has been administered, upon retirement, employees have been allowed to redeem these banked hours for prepaid medical and life insurance coverage or for other forms of cash-payouts. Generally, the Program has permitted employees to exchange eight unused sick leave hours for one full month's coverage of health insurance.[6] Additional statutory provisions

---

1. Utah Code Ann. § 67–19–14 (1979).

2. *See id.*

3. Utah Code Ann. § 67–19–14 (1983) ("The program shall provide for an employee to be paid for 25% of unused accumulated sick leave at the employee's preretirement rate of pay.... An employee ... whose unused sick leave, after the 25% cashout has been paid ... may continue health and life insurance.").

4. *See* Utah Code Ann. § 67–19–14.2 (1983), (1988), (1993), (1998), (1999).

5. Utah Code Ann. § 67–19–14.2 (2004) ("[U]pon retirement an employee is paid *for up to 25%* of the employee's unused accumulated sick leave at the employee's rate of pay at the time of retirement." (emphasis added)).

6. More specifically, the Program allows each retiring employee to receive continuing medical

and life insurance benefits for up to five years or until age 65, whichever occurs first. As briefly mentioned above, under the post–2004 version of the Program, upon retirement an employee may redeem unused sick leave hours in two ways:

(1) An employee is paid *for up to 25%* of the unused accumulated sick leave at the employee's rate of pay at the time of retirement. The employee may choose to have money from this pay-out transferred directly to the deferred compensation plan qualified under section 401(k) of the Internal Revenue Code sponsored by the Utah State Retirement Board.

(2) An employee may purchase additional continuing medical and life insurance benefits, at the rate of one month's coverage per policy for eight hours of unused sick leave remaining after:

(a) the 25% cash out of 401(k) payout, if any;

(b) *and* an additional mandatory deduction of 480 hours of unused sick leave.

*See* Utah Code Ann. § 67–19–14.2(2) (2004).

permit employees to apply the remaining unused sick leave hours to medical and life insurance coverage for spouses and other dependents once the employee reaches the age of Medicare eligibility.[7]

¶ 7 Our own research has also led to the discovery that there have been widespread inconsistencies between the uses of unused sick leave hour redemption permitted by the statute and those allowed by state personnel regulations.[8] In many instances, the regulations and practices appear to have permitted use of 100% of unused sick leave hours to be traded for medical and life insurance prior to 2004, although this practice was clearly unsupported by the statutory language between 1983 and 2004. In fact, legislative debate regarding the 2004 statutory amendment was represented by the bill's sponsors as intended to bring the statute into accord with the widespread practice of allowing retiring employees to apply all unused sick leave toward paid-up medical and life insurance at the rate of eight hours to one month of insurance.[9]

### B. H.B. 213: An Amendment to the Program

¶ 8 Beginning in 2003, the Legislature expressed increasing concern with escalating health insurance costs facing the State under the Program. In a short span of five years, the costs to the State for already retired employees nearly doubled. Moreover, the State anticipated an additional increase in the next ten years of more than 300%. The Legislature responded to these concerns by modifying the Program in 2005 with H.B. 213. In essence, this modification returns to the 1983–2004 statutory scheme, although not the actual practice, which allowed only 75% of the unused sick leave to be redeemed

for medical and life insurance. Under H.B. 213, the statutory scheme again limits the use of the other 25%: banked sick leave falls into one of two new programs, depending upon when the employee banked the sick leave hours.

¶ 9 "Program I" applies to all sick leave accrued *prior* to January 1, 2006, and implements a gradual, five-year phase-out of the guaranteed continuing medical and life insurance benefits (and the corresponding 480-hour automatic reduction of unused sick leave) that had been guaranteed under the original Program. Program I also eliminates the original Program's provision permitting employees to cash-out up to 25% of their unused sick leave and instead mandates that 25% be contributed to the employee's 401(k). Plaintiffs challenge the constitutionality of the Program I modifications as substantially reducing the value of what they believe to be a vested right to use all 100% of banked sick leave in exchange for post-retirement medical and life insurance at the rate of eight hours of leave to one month of insurance coverage.

¶ 10 "Program II", on the other hand, applies to all unused sick leave hours accrued *after* January 1, 2006. There is no dispute between the parties that the State may implement program changes with prospective effects. We find nothing erroneous in that agreement, and as a result, we need not address the provisions of H.B. 213 that apply to Program II.

### C. The Parties

¶ 11 Plaintiffs Roes 1 through 5 have cumulatively banked more than 8,000 hours of unused sick leave prior to January 1, 2006.[10]

---

7. *Id.* §§ 67–19–14.2(2), 67–19–14.2(4)(a).

8. *See, e.g.,* Utah Admin. Code R477–8–7(6)(c) (2000) ("An employee *may* elect to receive a cash payment or transfer ... *up to* 25 percent of his accrued unused sick leave at his current rate of pay." (emphasis added)).

9. The bill's sponsor, Representative David Clark, introduced the bill by stating that "[i]n fact, the purpose of this legislation is to make clarifying changes only *that are based on current agency interpretations and implementations of practice. There are no substantive changes that are meant*

*or to be included in this draft."* Audio recording: House Debate of H.B. 11, 55th Leg., Gen. Sess. (Feb. 10, 2004), *available at* http://le.utah.gov/asp/audio/index.asp?Sess=2004GS & Day=0 & Bill=HB0 011 & House=H (emphasis added).

10. Plaintiffs' complaint asserts the following facts about Roes 1 through 5:

(1) Roe 1 is 62 years old and has worked for the State for over 30 years. He has accumulated over 1,800 hours of unused sick leave and had planned to retire in 2006, but due to the changes

In banking this many hours of sick leave, Roe Plaintiffs took personal leave days rather than sick leave and often worked when ill. Roes 1 through 5 testified that they had been told that if they did not retire by December 16, 2005, they would not be able to utilize all of their banked sick leave hours to acquire medical and life insurance as they could have under the 2004 statutory scheme. Roes 1, 2, 4, and 5 are currently employed with the State; Roe 3 retired on August 1, 2005. The parties agree that a number of state employees retired prior to December 16, 2005, to preserve the greater benefit allowed under the 2004 language of the statute.

¶ 12 Acting in its role as the labor association representing the interests of current and former public employees on matters pertaining to public employment, UPEA commenced this suit along with Roes 1 through 5. The record reflects the extensive communication between UPEA and its members after the proposal of H.B. 213 and demonstrates that UPEA adequately represents the interests of its members in this case.

## II. PROCEDURAL BACKGROUND

¶ 13 Plaintiffs UPEA and Roes 1 through 5 filed their complaint on June 29, 2005, in the district court and subsequently moved for a preliminary injunction to stay the effective date of H.B. 213 pending resolution of their constitutional challenge. The State opposed the injunction and moved for a dismissal based on the allegations of the pleadings. After briefing, the district court held evidentiary hearings on November 7, 9, 16, and 18, 2005. On December 8, 2005, the district court denied Plaintiffs' motions for a prelimi-nary injunction and granted the State's motion for a judgment in its favor on the pleadings.

¶ 14 Plaintiffs petitioned this court on December 13, 2005, for an emergency stay on the effective date of the statutory changes to allow an appeal of the district court's decision. Absent such an emergency stay, the window of opportunity for employees otherwise in a position to realize the greater benefit of exchanging 100% rather than 75% of their unused sick leave for paid insurance upon retirement would have expired within three days of the matter reaching us. We granted the emergency stay on December 14, 2005, and enjoined, for at least until thirty days after the final disposition of this appeal, the implementation of H.B. 213's provisions insofar as they amend Utah Code section 67–19–14.2. The State filed a motion to vacate the order granting emergency relief and requested oral arguments on the matter, which we heard on December 15, 2005. The State argued that the petition did not meet the necessary standards we impose for such relief, but ultimately agreed to the ongoing injunction with the request that the court act with all possible haste so that the impending legislative session might deal with any necessary revisions of the scheme. We denied the State's motion to vacate the order granting emergency relief, and to facilitate expedited review of the matter on its merits, ordered Plaintiffs to perfect their appeal on or before December 29, 2005, ordered expedited briefing by the parties, and set oral argument on the merits for January 10, 2006.

¶ 15 Given the extremely short time allotted to each party to present its arguments in

implemented with H.B. 213, he plans to retire before the bill becomes effective. If he retires after the bill becomes effective, he loses nearly 5 years of health insurance coverage which would have been covered by his accrued unused sick leave.

(2) Roe 2 is 58 years old and has worked for the State for over 30 years. He plans on retiring upon turning 60 in 2007. Under the Program, his accumulated unused sick leave provides him with medical insurance until reaching 80 years and 10 months old. Under H.B. 213, however, his accrued unused hours will provide him with health insurance benefits only until he is 75 years and 7 months old, a difference of over 5 years of coverage.

(3) Roe 3 is 45 years old and has worked for the State for over 20 years. He has accumulated over 2,100 hours of unused sick leave. The effectiveness of H.B. 213 decreases the value of his unused sick leave coverage by 5½ years.

(4) Roe 4 is 51 years old and has worked for the State for over 20 years. Post–H.B. 213, Roe 4 loses 6 years of medical coverage.

(5) Roe 5 is 40 years old and has worked for the State for 14 years. She has accumulated over 700 hours of unused sick leave and has recently declined numerous employment offers from private employers, specifically relying on the State's health insurance benefits from the pre-H.B. 213 Program.

the briefs, the submissions were adequate. However, after oral argument, it became obvious to the court that important and influential matters had not been included in any briefing or argument by either party. Consequently, on January 23, 2006, we requested additional briefing. The parties had failed to address the complex history of the statutory scheme and its relevance to the constitutional challenge presented. Moreover, the parties insisted on staking out diametrically opposing positions, apparently without any thought of assisting the court in finding a principled, legally correct solution to the problem created by the obtuse language employed in the statute and the actual practice engaged in by the State over decades. Unfortunately, although the court requested the parties to address those questions that most concerned it, the parties chose in their supplemental briefs to either discount the importance of the issues raised by the court or failed to shed any meaningful light on the questions.

¶ 16 Ordinarily, in matters presented to the court, the parties and the court have the benefit of thoughtful and thorough analysis by both the parties and the lower court to expose and resolve questions. In the case of an expedited review of this sort, where the district court's order had not even been reduced to writing at the time the petition was presented to us for action, and the time for preparation of the briefs, record, and other supplemental materials necessary for our review has been shortened to the point of practical elimination, the usual help given to the court by the parties has been diminished.

¶ 17 Nevertheless, it is the obligation of the court to reach a conclusion on the questions presented. To not answer, or to refuse to answer under such pressure of time, and with inadequate help from the parties, is not an option. However, since there is no other authority available to review and correct our errors in judgment on the legal merits of the case presented should we wrongly decide the question of constitutionality of the statute, we are also required to do all that we can to discover, consider, and incorporate those legal and statutory elements that are critical to a correct decision. This we have labored to do.

¶ 18 It is also important to note that in a republican form of government, and as specified in our state constitution, the judicial power of the State is vested in this court. Moreover, judges must exercise that power only in accord with the law and the facts of the case, without regard to pressures brought by the other branches of government or special interests of any kind. This, too, we have labored to do. If media reports are accurate of threats by members of the Legislature to withhold salary increases for all state employees generally, and judicial salaries in particular, in an effort to force this court to act more quickly or to reach a certain result, then those making such threats fail to grasp the very core of the separation of powers doctrine and the value to the people of our state of a truly independent and responsible judiciary. Further, the suggestion in the briefing of the State that a decision unfavorable to the State's position might result in a negative impact on judicial retirement benefits, among others, might also be perceived as an unwise effort to appeal to personal interests, an effort that we reject as disrespectful of our function and therefore of the constitutional responsibilities of the judicial branch itself.

## ANALYSIS

### I. PLAINTIFFS MAY ASSERT A FACIAL CHALLENGE TO H.B. 213

¶ 19 When challenging the constitutionality of a statute, Plaintiffs carry the burden of establishing that the statute is "unconstitutional either on its face or as applied to the facts of the given case." [11] In this instance, because the statutory changes set forth in H.B. 213 are not yet effective, the parties may assert only a facial challenge. They concede that an as applied challenge would be improper.

---

11. *State v. Herrera*, 1999 UT 64, ¶ 4 n. 2, 993 P.2d 854; *see also Smith Inv. Co. v. Sandy City*, 958 P.2d 245, 251 (Utah Ct.App.1998) (explaining that plaintiffs carry a "heavy burden" in facial challenges).

¶ 20 The State contests the availability to Plaintiffs of a facial challenge, relying on *United States v. Salerno*, a case in which the United States Supreme Court required the challenger to establish that "no set of circumstances exists under which the [challenged] Act would be valid" in order to succeed.[12] However, in its reliance on *Salerno*, the State fails to acknowledge that both the United States Supreme Court and this court have discredited, at least to some extent, the application of the *Salerno* standard. The facts of this case present circumstances where *Salerno* is not the correct standard and need not be followed.

¶ 21 When state courts interpret their own state law, the United States Supreme Court has not required adherence to *Salerno*. The plurality opinion in *City of Chicago v. Morales* clarified that the "assumption that state courts must apply the restrictive *Salerno* test is incorrect as a matter of law; moreover it contradicts 'essential principles of federalism.' "[13] We agree. The Court explained that because state courts are not bound by federal law when assessing the constitutionality of state law under state constitutions, they need not follow the narrow interpretation of facial challenges found in *Salerno*.[14]

¶ 22 The *Morales* Court also suggested, by referencing scholarly articles on the matter, that in state law cases in state courts, a more appropriate threshold for determining the validity of facial challenges may simply exist in establishing the substantive merits of the case—the unconstitutionality of the legislation.[15]

¶ 23 More importantly in this situation, we have rejected the *Salerno* standard in some instances and have discredited its universal application. For instance, in *State v. Gardner*, an Eighth Amendment Cruel and Unusual Punishment Clause case, we determined that the "[s]tate's reliance on the due process standard—'no set of circumstances exists under which the act would be valid' [from *Salerno* ]—[was] ... misplaced."[16] We relied rather on the broader Supreme Court standard for cruel and unusual punishment cases found in *Gregg v. Georgia.*[17]

¶ 24 We have also declined to apply *Salerno* in takings cases. In *Smith Investment Company v. Sandy City*, for example, our court of appeals turned to the substantive law in determining whether a facial challenge was proper.[18] In other words, the court looked specifically to the constitutionality of the legislation affecting the challenger's property.[19] The court held that if plaintiffs do not allege "any injury due to the enforcement of the statute, there is as yet no concrete controversy regarding the application of the specific provisions and regulations. Thus, *the only question before this court is whether the mere enactment of the statutes and regulations constitutes a taking.*"[20] This is an approach we endorse. Many other courts in the United States have likewise relied on the substantive merits of the tak-

12. 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

13. 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (quoting Michael C. Dorf, *Facial Challenges to State and Federal Statutes*, 46 Stan. L.Rev. 235, 284 (1994)).

14. *See id.* ("Whether or not it would be appropriate for federal courts to apply the *Salerno* standard in some cases—a proposition which is doubtful—state courts need not apply prudential notions of standing created by this Court.").

15. *See id.; see, e.g.*, Michael C. Dorf, *Facial Challenges to State and Federal Statutes*, 46 Stan. L.Rev. 235 (1994).

16. 947 P.2d 630, 645 (Utah 1997) ("[A] facial challenge to a statute under the Eighth Amendment's cruel and unusual punishment provision

requires a different standard than that applicable under the due process clause at issue in *Salerno*.").

17. *Id.* (rejecting *Salerno* to follow *Gregg v. Georgia*, 428 U.S. 153, 175, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)).

18. 958 P.2d 245, 251 (Utah Ct.App.1998) (relying on *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987)).

19. *Id.*

20. *Keystone Bituminous*, 480 U.S. at 493, 107 S.Ct. 1232.

ings claim in determining the validity of a facial challenge.[21]

¶ 25 Plaintiffs' facial challenge is validly brought under both United States Supreme Court jurisprudence and our own case law. As articulated by the Supreme Court in *Morales*, an essential principle of federalism is that states have the authority to create their own constitutional law when reviewing claims brought under their own state constitution. Here, Plaintiffs have filed their takings claim under the Utah Constitution in Utah state court. Consequently, we are not required to follow *Salerno's* "restrictive" test for facial challenges, and we elect not to in this instance. Rather, we conclude that because Plaintiffs UPEA and Roes 1 through 5 have undisputed standing, the ultimate test for the propriety of bringing a facial challenge lies in the substantive merits of the claim. Thus, our analysis turns on the question of whether H.B. 213 constitutes an unconstitutional taking as alleged.

## II. THE RETROACTIVE APPLICATION OF H.B. 213 DOES NOT CONSTITUTE AN UNCONSTITUTIONAL TAKING

¶ 26 The thrust of Plaintiffs' claim is that the imposition of the retroactive provisions of H.B. 213 constitutes an unconstitutional taking of their vested property interest in the banked unused sick leave. Article I, section 22 of the Utah Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation." We have previously defined what

constitutes a taking under this constitutional provision: "A 'taking' is 'any substantial interference with private property which destroys or materially lessens its value, or by which the owner's right to its use and enjoyment is in any substantial degree abridged or destroyed.'"[22] Thus, to establish that H.B. 213 results in an impermissible taking, Plaintiffs must demonstrate that they have a protectable property interest in redeeming the banked sick leave hours for medical and life insurance and that provisions of H.B. 213 would result in the government's taking of that property.

### A. Plaintiffs Do Not Have a Property Interest in the Specific Use of Their Unused Sick Leave

¶ 27 "A claimant must possess some protectable interest in property before [being] entitled to recover[y] under this [takings] provision."[23] In this case, Plaintiffs argue that exchanging their banked and unused sick leave hours for medical and life insurance at the rate authorized by the 2004 version of the statute is vested personal property to which they have a contractual right. As a general rule, public employment is governed by statute and legislative policy, and is therefore subject to change as thought best by the people, acting through their legislative representatives.[24] Nevertheless, the modification of the terms of public employment are subject to two common sense exceptions to the general rule: first, when a public employee has a vested contractual in-

---

**21.** *See, e.g., NJD, Ltd. v. City of San Dimas*, 110 Cal.App.4th, 1428, 1438–39, 2 Cal.Rptr.3d 818 (2003) (describing the test for a valid facial challenge as "straightforward" and based on the substantive law: "whether the mere enactment of the legislation constitutes a taking"); *Shea Homes Ltd. P'ship v. County of Alameda*, 110 Cal.App.4th 1246, 1266–67, 2 Cal.Rptr.3d 739 (2003) ("A facial challenge questions only 'whether the mere enactment of' the land use regulation constitutes a taking. The test to be applied in considering a facial challenge is straightforward."); *Glisson v. Alachua County*, 558 So.2d 1030, 1036 (Fla.Dist.Ct.App.1990) (noting that when a taking claim arises in the context of a "facial challenge rather than in the context of a concrete controversy . . ., the only issue is whether the mere enactment of the regulation constitutes a taking. The test to be applied in considering a facial challenge is relatively

straightforward, i.e., '[a] statute regulating the uses that can be made of property effects a taking'").

**22.** *Colman v. Utah State Land Bd.*, 795 P.2d 622, 625 (Utah 1990) (quoting *State ex rel. State Rd. Comm'n v. Dist. Court, Fourth Judicial Dist.*, 94 Utah 384, 78 P.2d 502 (1937)).

**23.** *Id.* at 625; *see also Smith v. Price Dev. Co.*, 2005 UT 87, ¶ 12, 125 P.3d 945.

**24.** *Cf. Canfield v. Layton City*, 2005 UT 60, ¶ 16, 122 P.3d 622; *Buckner v. Kennard*, 2004 UT 78, ¶ 32, 99 P.3d 842; *Knight v. Salt Lake County*, 2002 UT App 100, ¶ 8, 46 P.3d 247; *Hom v. Utah Dep't of Pub. Safety*, 962 P.2d 95, 101 (Utah Ct.App.1998).

terest in retirement benefits;[25] or second, when the government entity has entered into an express or implied contract by voluntarily undertaking additional obligations beyond the relevant statutory requirements.[26] Plaintiffs argue that they have valid contractual rights under both exceptions. We disagree.

### 1. Plaintiffs lack vested contract rights.

¶ 28 Plaintiffs assert their interests under the first exception, claiming that a public employee has a vested contractual interest in exchanging 100% of the unused sick leave hours for medical and life insurance at retirement. We disagree.

¶ 29 Both parties argue that a public employee obtains vested rights to retirement benefits "only when he has satisfied *all* conditions precedent."[27] We agree that parties must satisfy all conditions precedent before the rights vest. The pivotal question is at what point state employees satisfy the requisite conditions precedent to vest a protectable property interest in using 100% of their unused sick leave hours for medical and life insurance.

¶ 30 As always, we first look to the plain language of the statute to determine the conditions precedent. Based on the statute and the accompanying regulations,[28] the State contends that the statutory scheme unambiguously dictates that an employee may not receive retirement benefits until that employee *actually* retires. Plaintiffs, on the other hand, interpret the statutory language to mean that any member who chooses to bank unused sick leave has a vested property interest to use that sick leave for medical and life insurance benefits at retirement.

We disagree with both parties' statutory interpretations.

¶ 31 Instead, we find the statutory language ambiguous as to when an employee's right to redeem the unused sick leave for medical and life insurance vests. Section 67–19–14.2 states that "[a]n agency may offer the [ ]Program to an employee who is *eligible to receive retirement benefits in accordance with Title 49*, Utah State Retirement and Insurance Benefit Act."[29] One might expect Title 49 to provide direction on the conditions precedent necessary for an employee to be "eligible to receive retirement benefits."

¶ 32 Title 49, however, fails to clarify when an employee is "eligible to receive retirement benefits." The Title, with its eight parts and forty-four statutory sections, speaks of "service credits," "benefits," and "allowances" but fails to explain the distinctions, including when an employee is eligible for each. The State argues that retirement benefits are synonymous with "allowances." Plaintiffs, on the other hand, argue that if an employee is earning service credits, an employee is eligible for retirement benefits but not for allowances. Our research indicates that neither retirement benefits nor allowances are used to define or explain one another, and that employees are generally eligible for service credits upon the effective date of employment.[30]

¶ 33 Absent clear language regarding or an obvious interpretation of "eligible to receive retirement benefits" in section 67–19–49 and Title 49, we conclude that the statutory language is ambiguous. It is clearly capable of more than one logical meaning within the statutory scheme. For example, a state employee might be "eligible to receive retirement benefits" when she reaches the length of service required for retirement and the

---

**25.** *See, e.g., Hansen v. Pub. Employees Ret. Sys.,* 122 Utah 44, 246 P.2d 591 (1952); *Newcomb v. Ogden City Pub. Sch. Teachers' Ret. Comm'n,* 121 Utah 503, 243 P.2d 941 (1952); *Driggs v. Utah Teachers Ret. Bd.,* 105 Utah 417, 142 P.2d 657 (1943).

**26.** *See Canfield,* 2005 UT 60, ¶ 16, 122 P.3d 622; *Buckner,* 2004 UT 78, ¶ 32, 99 P.3d 842.

**27.** *Hom,* 962 P.2d at 100.

**28.** For example, R477–7–6 of the Human Resource Management Regulations Governing Sick Leave and Sick Leave Retirement Benefits found in the Utah Administrative Code states that "[u]pon retirement from active employment, an employee may be offered a retirement benefit program, according to Section 67–19–14(2)."

**29.** Utah Code Ann. § 67–19–14.2(b) (emphasis added).

**30.** *See* Utah Code Ann. §§ 49–12–201(1), –401.

age required for retirement, and submits her signed notice of retirement to the appropriate office or official of state government. Alternatively, one might be "eligible to receive retirement benefits" when reaching the service and age minimums, even if he continues to work. Additionally, one might be considered "eligible to receive retirement benefits" when one is employed in a full-time position by the State, in an agency or position for which there exists a retirement program under the extensive provisions of Title 49. While one or more of these possibilities may seem more logical, useful, or fair than another, such is not the question we face. Unable to accurately discern from the naked language alone which of the possible meanings is the meaning intended by the legislative drafters, we have no choice but to examine other appropriate evidence of what meaning is correct.

¶ 34 Moreover, the plausible interpretations of the isolated word "eligible" in both section 67–19–14.2 and Title 49 also render the statutory language ambiguous. The State suggests that one is "eligible" when one is "qualified" to receive an allowance.[31] UPEA, on the other hand, argues that because Title 49 never refers to "eligibility" in relation to allowance but rather only in respect to service credits, "eligible to receive retirement benefits" cannot be synonymous with "qualified to receive an allowance."

¶ 35 Furthermore, our prior case law suggests that "eligible to receive retirement benefits" is an ambiguous phrase. In *Hansen v. Public Employees Retirement System Board of Administration*, for instance, we struggled with how to define eligibility for retirement benefits.[32] We held there that an employee "who has neither served the necessary years to qualify for pension, nor attained the retirement age[ ] has no vested rights in the pen-

sion or retirement system"[33] and that since the plaintiff had "neither served the time requisite to entitle him to retire and receive a pension, nor had he attained retirement age," he had no vested rights in a pension or the retirement system.[34] This interpretation adds to the ambiguity because it implies that an employee may be eligible to receive retirement benefits upon attaining retirement age, serving a requisite number of years, qualifying for retirement benefits, or some combination thereof.

¶ 36 Consequently, we conclude that section 67–19–14.2 lacks a clear meaning for "eligible to receive retirement benefits" because the language gives rise to several plausible interpretations. As noted, it may refer to the time at which the employee walks out of the building for the last time and actually retires, or perhaps to the point when, after having worked for the State the requisite number of years to receive contributions to the Utah Retirement System, the employee chooses yet to continue state employment. It may also mean the condition described under Utah Code sections 49.12.201, 49.13.201, 49.14.201 and any of the other general membership requirements to the sixteen retirement acts listed under Title 49.[35] Each of those sections applies to any full-time employee whose employer chose to participate in the described program and who is earning service credits. Both the statutory language and Utah case law are ambiguous as to whether employees' property rights vest at eligibility for retirement, actual retirement, or eligibility for the payout.

¶ 37 We accordingly turn to the available indications of legislative intent to determine at what point all conditions precedent are satisfied for the vesting of employees' right to redeem unused sick leave for medical and life insurance under the Program.[36] The

---

**31.** *See* Utah Code Ann. §§ 49–12–401(1), –402; 49–13–401(1), –402.

**32.** 122 Utah 44, 246 P.2d 591, 596 (1952).

**33.** *Id.*

**34.** *Id.* at 596–97.

**35.** Utah Code Ann. §§ 49.12.201, 49.13.201, 49.14.201 (2004).

**36.** *See Murphy v. Crosland*, 886 P.2d 74, 80 (Utah Ct.App.1994) ("[W]here there is an ambiguity or uncertainty in a portion of a statute ... and if it is reasonably susceptible of different interpretations, the one should be chosen which best harmonizes with its [the statute's] general purpose.").

legislative intent behind these particular retirement benefits is clearly stated as "inducements to work for the state"[37] and "to reduce sick leave abuse."[38] Logically, no incentive exists if, as the State urges, the agency may *offer* the benefit only on the occasion of the employee leaving his or her state job by retirement. A benefit not known until the very day on which the employee can do nothing to earn it, is no incentive at all.

¶ 38 In fact, the undisputed evidence before the district court was that state agencies routinely described the availability of the sick leave conversion to prepaid medical and life insurance at retirement to their employees for the very purpose described in the statute: to encourage state employees to remain state employed in the face of lower wages than available elsewhere, and to encourage limited use of sick leave.

¶ 39 Thus, we conclude that state agencies inviting employees to participate in the Program during the course of their state employment constituted an offer by the State.

¶ 40 We also conclude, however, that the State's offer was to exchange the unused sick leave for a benefit upon retirement, but not necessarily any particular benefit. The various changes in the statutory scheme from 1979 to 2004 clearly demonstrate that the Legislature intended to reserve the ability to modify the menu of available benefits, and did not intend to bind the State forever to redeem 100% of the unused sick leave hours for any one use, and in particular not necessarily for medical and life insurance.

¶ 41 The critical issue is at what point employees can act to accept the offer to redeem banked sick leave exclusively for medical and life insurance. This is an important question because employees' property interest to use these accrued hours for medical and life insurance vests only after an acceptance of the State's offer to redeem them in such a way.

¶ 42 In our review of the statutory language and relevant legislative history, we are compelled to conclude that the State intended employees to accept the offer to redeem the hours for unused sick leave only *upon retirement*. For example, the regulations promulgated pursuant to the statute provide that "[u]pon retirement from active employment, an employee may be offered a retirement benefit program, according to Section 67–19–14.2."[39] We can only interpret this to mean that at the time of retirement an employee is offered a choice of the manner in which the hours may be exchanged for other benefits of value. Those choices can only be from those delineated in the then-current statutory version of the Program. Only at that point may the employee accept that particular offer to redeem the hours in the manner set forth in the current statute. Moreover, as a matter of ordinary contract law, until accepted, the State's offer is subject to unilateral modification. Thus, a property interest in accumulated sick leave hours for the specific purpose of exchanging them for paid medical and life insurance cannot vest, as a matter of law, until the employee retires. The result is that the first exception to the general rule is of no consequence in our analysis of Plaintiffs' claims.

2. The State undertook a voluntary obligation.

¶ 43 Nevertheless, a contract in a public employment setting may also arise if the State "voluntarily undertake[s] an additional duty that it would otherwise have no obligation to perform."[40] Plaintiffs argue that their contractual rights exist because State agencies did exactly that in offering the Program to their employees.

---

**37.** Utah Code Ann. § 67–19–3(16) (2005) (" 'Total compensation' means salaries and wages, bonuses, paid leave, group insurance plans, *retirement, and all other benefits offered to state employees as inducements to work for the state."* (emphasis added)).

**38.** *Id.* § 67–19–14 (1979); *id.* § 67–19–14 (1983); *id.* § 67–19–14(1) (1988); *id.* § 67–19–14(1) (1993); *id.* § 67–19–14(1) (1998); *id.* § 67–19–14(1) (1999).

**39.** Utah Admin. Code R477–7–6 (2005).

**40.** *Buckner v. Kennard,* 2004 UT 78, ¶ 34, 99 P.3d 842.

¶ 44 The State, on the other hand, argues that in permitting agencies to choose whether to offer employees the benefits of the Program, those agencies failed to undertake an additional obligation *beyond* statutory terms,[41] since the statutory scheme *authorized* the offer. The State misinterprets prior Utah cases on the issue. The cases to which the State cites, namely, *Buckner v. Kennard*,[42] *Knight v. Salt Lake County*,[43] and *Hom v. Utah Department of Public Safety*,[44] deal specifically with changes to prospective compensation, hiring procedures, or other employment structures controlled only by statute and which the State *required* the involved agencies to adopt. The statutory terms at issue in those instances were not regarding additional duties that the agencies "would otherwise have no obligation to perform." [45]

¶ 45 With the Program at issue in this case, however, state agencies had no obligation to offer the incentives found in Utah Code section 67–19–14.2 to their employees. Instead, the Legislature specifically constructed the statute to state that "[a]n agency *may* offer the Unused Sick Leave Retirement Option Program" to its employees.[46] Therefore, in choosing to offer the Program, state agencies volunteered to undertake the additional duty of providing enhanced retirement benefits in exchange for the employee taking fewer sick days and for staying with the State until retirement. This constituted a valid offer to redeem unused sick leave hours upon retirement.

¶ 46 Nevertheless, the critical question remains at what point in time employees are able to accept the offer. As described above, employees may not accept this offer until retirement. The State's offer of various pay-out options, specifically, the 401(k), cash-out, or medical and life insurance coverage, can only be accepted when employees retire. At that point, an employee chooses how to re-

deem accumulated unused sick leave from the options then available, and the State is bound. Until that time, however, the State retains the ability to modify terms of the offer as needed or prudent.[47]

¶ 47 Therefore, although the State voluntarily undertook an obligation to employees who bank unused sick leave to allow those employees to eventually redeem unused sick leave hours for value, the State's offer does not lock in the method of pay-out until retirement. Consequently, it cannot be said that the State voluntarily undertook an obligation to permit employees to redeem 100% of their unused sick leave hours for medical and life insurance. Absent this specific voluntary obligation by the State, employees have no protectable property interest in redeeming all or any of those hours for medical and life insurance until they reach actual retirement and make the appropriate election from among the then-available options.

### B. We Need Not Address Whether H.B. 213 Materially Lessens the Value of Plaintiffs' Property Interest

¶ 48 Because the ability to redeem 100% of the banked unused sick leave hours for a particular purpose does not vest until the employee makes a choice at the time of retirement, the option of using them all for paid insurance is not personal property and cannot be taken by the State. Consequently, we need not consider the second prong of the takings analysis, namely, whether H.B. 213 substantially interfered with the unused sick leave hours in a manner that destroyed or materially lessened their value or abridged or destroyed employees' use or enjoyment of them in any substantial degree.[48] Because Plaintiffs lack a constitutionally protected property interest in redeeming 100% of their unused sick leave hours for medical and life insurance, their takings claim fails.

---

41. *See id.*

42. 2004 UT 78, 99 P.3d 842.

43. 2002 UT App 100, 46 P.3d 247.

44. 962 P.2d 95 (Utah Ct.App.1998).

45. *Buckner*, 2004 UT 78, ¶ 34, 99 P.3d 842.

46. Utah Code Ann. § 67–19–14.2(1)(b).

47. *See* Utah Code Ann. § 67–19–14.2 (the title to the section includes "Payout at Retirement").

48. *See Colman v. Utah State Land Bd.*, 795 P.2d 622, 625 (Utah 1990).

## CONCLUSION

¶ 49 Plaintiffs UPEA and Roes 1 through 5 have properly raised a facial challenge to H.B. 213. Their facial challenge fails on the merits because implementation of H.B. 213 does not result in an unconstitutional taking under the Utah Constitution. Plaintiffs have no present property interest in redeeming their unused sick leave hours for medical and life insurance because (1) although the State voluntarily offered to undertake a contractual duty with them, State employees cannot accept the offer specifying the form of redemption until retirement, and (2) Plaintiffs contractual rights cannot vest until that offer has been accepted. Further fact finding regarding a vital state interest and a substantial substitute are unnecessary because Plaintiffs lack a constitutionally protected property interest. Thus, we conclude that H.B. 213 does not effect a taking of property and is therefore constitutional under article I, section 22 of the Utah Constitution.

¶ 50 The decision of the trial court is affirmed. The stay and injunction imposed by this court is vacated, effective 30 days from the date of this opinion. Further relief is denied.

¶ 51 Chief Justice DURHAM and Judge GREENWOOD concur in Associate Chief Justice WILKINS' opinion.

¶ 52 Having disqualified himself, Justice DURRANT does not participate herein; Utah Court of Appeals Judge PAMELA T. GREENWOOD sat.

PARRISH, Justice, concurring:

¶ 53 I agree with the lead opinion's conclusion that H.B. 213 does not effect an unconstitutional taking of plaintiffs' property. I write separately to express my opinion that state employees had no vested right to exchange their accrued sick leave for health insurance because the plain language of the 2004 version of the Unused Sick Leave Retirement Option Program ("Option Program"), Utah Code Ann. § 67–19–14.2, limited participation in the program to those employees eligible to receive retirement benefits. Accordingly, state agencies could offer the program only to those employees

who had elected to retire. Further, were I to assume the existence of a statutory ambiguity with regard to the vesting issue, I would conclude that extrinsic evidence of legislative intent and relevant principles of statutory construction dictate the same result.

¶ 54 Plaintiffs raise only one claim on appeal, a facial challenge to the constitutionality of H.B. 213. Resolution of their facial challenge hinges on whether they can establish that they had a vested right to exchange 100% of their accrued sick leave for insurance. If so, H.B. 213 effects an unconstitutional taking of their property. If not, their challenge fails.

¶ 55 As the lead opinion correctly states, because the terms of public employment are generally governed by statute and legislative policy, they are subject to legislative change. We have recognized only two exceptions pursuant to which a public employee may acquire a contractual interest in employment benefits. The first is when a governmental employer has entered into an express or implied contract by voluntarily undertaking obligations beyond those provided by statute. *See Canfield v. Layton City,* 2005 UT 60, ¶ 16, 122 P.3d 622. The second is when an employee acquires a vested contractual interest pursuant to the terms of the operative statute. *See Hansen v. Pub. Employees Ret. Sys.,* 122 Utah 44, 246 P.2d 591, 595–96 (1952). I will address each exception in turn.

## I. PLAINTIFFS CANNOT ESTABLISH ANY PROPERTY INTEREST PURSUANT TO THE VOLUNTARY UNDERTAKING EXCEPTION

¶ 56 To give rise to a protectable property interest under the voluntary undertaking exception, the voluntary undertaking must stem from an agreement that alters or adds to the statutory terms and conditions of public employment. *See Buckner v. Kennard,* 2004 UT 78, ¶ 34, 99 P.3d 842. This exception appears inapplicable in a case such as this where plaintiffs have raised only a facial challenge to the governing statute.

¶ 57 As the trial court found, the plaintiffs in this case rested their claims entirely on

the statutory language. Plaintiffs presented no evidence and the trial court made no finding of any obligation or undertaking by state agencies apart from the decision of the agencies to participate in the Option Program as set forth in the governing statute. While agency participation in the Option Program was voluntary, the terms of that participation were indisputably statutory. Because plaintiffs lodge only a facial challenge to H.B. 213, their voluntary undertaking argument is entirely dependent upon the statutory language, which, as discussed below, dictates that any offer of program benefits may occur only upon retirement.

## II. THE PLAIN STATUTORY LANGUAGE DOES NOT CREATE ANY VESTED RIGHTS IN STATE EMPLOYEES UNTIL THEY ELECT TO RETIRE

¶ 58 I believe that the statutory language is determinative in resolving plaintiffs' claim that they had a vested right to exchange 100% of their unused sick leave for health insurance. In prior cases involving the claims of public employees, we have reasoned that the rights at issue "rest largely upon the language of the particular statute" involved. *Driggs v. Utah Teachers Ret. Bd.*, 105 Utah 417, 142 P.2d 657, 663 (1943); *see also Newcomb v. Ogden City Pub. Sch. Teachers' Ret. Comm'n*, 121 Utah 503, 243 P.2d 941, 944 (1952) ("[T]he rights of pensioners must be determined by the purpose and language of the retirement act.").

¶ 59 When construing statutory language, this court adheres to the well-accepted rule that we do " 'not look beyond the plain language of [the] provision unless we find some ambiguity in it.' " *State v. Ostler*, 2001 UT 68, ¶ 7, 31 P.3d 528 (alteration in original) (quoting *In re Worthen*, 926 P.2d 853, 866 (Utah 1996)); *Wilcox v. CSX Corp.*, 2003 UT 21, ¶ 8, 70 P.3d 85. Only upon finding ambiguity may we "seek guidance from the legislative history and relevant policy considerations." *Ostler*, 2001 UT 68, ¶ 7, 31 P.3d 528 (internal quotation marks omitted). In other words, we may not resort to extrinsic aids of interpretation unless we first find ambiguity in the statutory text. *See id.*

¶ 60 Like a contract, a statute is ambiguous when it may reasonably "be understood to have two or more plausible meanings." *Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1274 (Utah 1993) (internal quotation marks omitted) (defining ambiguity in the context of a contract); *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 15, 133 P.3d 428. But determining whether there are two or more plausible meanings depends not only on the text of the particular provision at issue, but also on the text of the statute as a whole. *See Morton Int'l v. Auditing Div. of the Utah State Tax Comm'n*, 814 P.2d 581, 591 (Utah 1991). Indeed, "[w]e 'read the plain language of the statute as a whole, and interpret its provisions in harmony with other statutes in the same chapter and related chapters.' " *State v. Barrett*, 2005 UT 88, ¶ 29, 127 P.3d 682 (quoting *Miller v. Weaver*, 2003 UT 12, ¶ 17, 66 P.3d 592). As a result, a statute susceptible to competing interpretations may nevertheless be unambiguous if the text of the act as a whole, in light of related statutory provisions, makes all but one of those meanings implausible. *Id.* When viewing the act as a whole does not eliminate duplicative yet plausible meanings, the statute is ambiguous, and we may resort to extrinsic interpretive tools to resolve the ambiguity. *See Ostler*, 2001 UT 68, ¶ 7, 31 P.3d 528.

¶ 61 As the lead opinion ably explains, the statutory iterations of the Option Program from 1983 through 2004 all required that employees convert at least 25% of their accrued sick leave to cash or a 401(k) contribution. In all respects material to this appeal, these prior iterations are therefore indistinguishable from H.B. 213. As a result, only the 2004 iteration of the Option Program could have conceivably vested in state employees the right to convert to health insurance the first 25% of their accrued sick leave. I therefore confine my analysis to the 2004 statute.

¶ 62 The 2004 statute provides that "[a]n agency may offer the [Option Program] to an employee who is eligible to receive retirement benefits in accordance with Title 49, Utah State Retirement and Insurance Benefit Act." Utah Code Ann. § 67–19–14.2(1)(b) (2004). The lead opinion concludes that this language is ambiguous because it could be

construed to apply to (1) all regular, full-time state employees; (2) all state employees who have reached the requisite age and years of employment necessary to retire under a particular retirement system; or (3) retiring employees. I disagree and conclude that the statutory language effectively precludes agencies from even offering the Option Program until an employee has elected to retire.

¶ 63 My analysis necessarily starts with "the usual and natural meaning" of the operative terms of the statute. *See Saleh,* 2006 UT 1, ¶ 17 (internal quotation marks omitted). "Offer" is a verb meaning "an instance of presenting something for acceptance." *Black's Law Dictionary* 1113 (8th ed.2004). "Eligible" is an adjective referring to one who is "legally qualified for a[ ] . . . privilege, or status," or "[f]it and proper to . . . receive a benefit." *Id.* at 559. "Receive" is a verb meaning "to come into possession of." *Merriam–Webster's Collegiate Dictionary* 975 (10th ed.1998). And because the statute is phrased in the present tense, it allows an agency to offer the "Program to an employee who *is* eligible to receive retirement benefits," not to an employee who *may become* or who *could be* eligible to receive benefits some time in the future. Utah Code Ann. § 67–19–14.2(1)(b) (emphasis added). Moreover, subsection (2) of the statute specifically states that an employee may purchase continuing medical and life insurance benefits "upon retirement." *Id.* § 67–19–14.2(2).

¶ 64 The commonly understood definitions of these operative terms dictate that state agencies could present the Option Program for acceptance only to those employees who were *currently* legally qualified to come into possession of retirement benefits. This renders implausible the interpretation urged by plaintiffs, that the language allowed state agencies to offer the Option Program to all regular, full-time employees. It also undercuts the suggestion that the statute could plausibly be interpreted to allow agencies to offer the Option Program to employees with the requisite age and years of service necessary to enable them to retire but who have not elected to do so. Indeed, it is implausible to suggest that an employee who has not yet elected to retire could be eligible to *receive* (as opposed to be eligible to *apply for*) benefits. I therefore conclude that the text of section 67–19–14.2 prevents an agency from offering the Option Program until an employee elects to retire.

¶ 65 The majority rejects this interpretation as implausible because it believes such an interpretation is inconsistent with the stated legislative purpose of the program, which is to induce employees to reduce sick leave abuse. I find no such inconsistency. The fact that the program did not vest employees with the contractual right to exchange 100% of their accrued sick leave for health insurance does not necessarily mean that it could not operate as an effective incentive program.

¶ 66 Individuals routinely assume some degree of risk in making life decisions, and there is no reason why employees would necessarily require an ironclad guarantee before being motivated to reduce sick leave abuse. Nearly all aspects of compensation and retirement benefits in both the public and private sectors are offered as inducements to accept employment. But that does not mean that those benefits become immutable contractual guarantees as soon as an employee begins work or that any employee can reasonably expect that an employer will be offering the same benefits decades into the future. This principle is aptly illustrated by the fact that the pre–2004 iterations of the Option Program did not even include the option of exchanging the first 25% of accrued sick leave for health insurance. It is also illustrated by the majority's tacit assumption that the statutory purpose of reducing sick leave abuse is fulfilled by its construction of the statute—a construction that in practical effect differs not at all from the interpretation urged by the State and adopted by me.

¶ 67 My plain language construction of the Option Program is bolstered by the language of title 49 of the Utah Code, which is referenced in the 2004 statute. Title 49 of the Utah Code consists of the Utah State Retirement and Insurance Benefit Act. Chapter 11 of that act governs the administration of the system, while chapters 12 through 21 establish various retirement systems for specific classes of public employees. Although some

of the specific provisions of these various systems differ, the statutory structure of each follows a similar pattern, and each is consistent with my conclusion that eligibility to receive retirement benefits can occur only when an employee elects to retire.

¶ 68 First, each of the various systems distinguishes those employees who are merely eligible to participate in the retirement system from those employees who are eligible to receive an allowance from the system. Membership in the system is available to all "regular full-time employee[s] of a participating employer" and begins on "the effective date of employment." Utah Code Ann. § 49–12–201 (2002); *see, e.g., id.* §§ 49–13–201, 49–14–201 (Supp.2005). When the legislature referred to the class of employees eligible for participation in one of the state retirement systems, it used the phrase "eligible for service credit." E.G., Utah Code Ann. § 49–12–201. Because eligibility for service credit differs from eligibility to receive retirement benefits, I reject plaintiffs' contention that the phrase "eligible to receive retirement benefits" could plausibly be interpreted to refer to all regular, full-time state employees.

¶ 69 I find the provisions of title 49 addressing eligibility to receive allowances particularly helpful. For example, Utah Code section 49–12–401 (2002) provides:

(1) A member is qualified to receive an allowance from this system when:

(a) the member ceases actual work for a participating employer in this system before the member's retirement date and provides evidence of the termination;

(b) the member has submitted to the office a notarized retirement application form that states the member's proposed retirement date; and

(c) one of the following conditions is met as of the member's retirement date:

(i) the member has accrued at least four years of service credit and has attained an age of 65;

(ii) the member has accrued at least ten years of service credit and has attained an age of 62 years;

(iii) the member has accrued at least 20 years of service credit and has attained an age of 60 years; or

(iv) the member has accrued at least 30 years of service credit.

Each of the various retirement acts comprising title 49 contains a similar provision. *See, e.g., id.* §§ 49–13–401, 49–14–401 (Supp. 2005), 49–15–401 (2002).

¶ 70 At first glance, because these provisions use the phrase "qualified to receive an allowance," they do not appear to clarify the meaning of the phrase "eligible to receive retirement benefits" as used in section 67–19–14.2. But further examination of title 49 demonstrates that the legislature used the terms "allowance" and "retirement benefits" interchangeably. *See, e.g., id.* §§ 49–12–402(2) (Supp.2005) (the "Option One benefit is an annual allowance"), 49–12–405, (4) (referring to Option Three allowance as "[s]ervice retirement benefits" and stating that "benefits payable under this section are retirement benefits"), 49–11–401(3)(b) ("[a]n allowance or other benefit"), 49–11–405(3) (2002) (referring to a "member's allowance" as "benefit"). Moreover, the notion of being qualified or eligible to actually "receive" an allowance or benefit is common to both section 67–19–14.2 and section 49–12–401. They therefore support my conclusion that those employees who are "eligible to receive retirement benefits" must have satisfied the conditions specified by section 49–12–401 for receipt of an allowance.

¶ 71 Justice Nehring opines that my conclusion in this regard is undercut by other provisions of title 49. In fact, however, much of his analysis improperly draws on sources extrinsic to the statutory language. He suggests that the phrase "eligible to receive retirement benefits" is distinct from the phrase "qualified to receive an allowance" by drawing a distinction between the terms "eligible" and "qualified." [1] But this distinction stems from an inspection of the statutory

---

1. Plaintiffs have never urged the interpretation of the 2004 statute articulated by Justice Nehring, a fact somewhat at odds with Justice Nehring's

suggestion that his interpretation is driven by the "plain" language of the statute.

language of pre–2004 versions of section 67–19–14. Prior to 2004, the statute provided that "[a]n employee must be eligible for retirement benefits to qualify for the program." Utah Code Ann. § 67–19–14 (Supp.1999). Because the predecessor versions of the 2004 statute used both "eligible" and "qualify," Justice Nehring concludes that these words cannot be ascribed the same meaning. He then suggests that, because legislative history indicates that the legislature did not wish to make substantive changes when passing the 2004 version of the statute, the reference to title 49 must have implicitly preserved the distinction found in prior iterations of the program. Finally, Justice Nehring construes "eligible to receive retirement benefits" to mean "eligible to retire." I pause to briefly respond to these contentions.

¶ 72 First, we may not look to extrinsic aids to ascertain the meaning of a statute where the statute is plain on its face. Past versions of a statute and legislative history are indisputably extrinsic aids. As such, they may be helpful in resolving an ambiguity, but they may not be employed to create one. As discussed above, the plain meaning of the statute is that an agency may not offer the Option Program to an employee until she elects to retire. Where the statutory meaning is plain, resort to past versions of the statute and legislative history is improper. Moreover, because the 2004 version of the statute does not use both "eligible" and "qualify," the dichotomy that Justice Nehring attempts to create between the two terms does not logically become an issue.

¶ 73 In fact, the words "eligible" and "qualified" are synonymous, and our case law does not mandate a distinction between the two in the context of the Option Program. We have stated that we give effect to each term of a statute and assume that the legislature used each term advisedly. *State v. Barrett*, 2005 UT 88, ¶ 29, 127 P.3d 682. But this does not mean that we must, in all cases, ascribe competing meanings to synonymous terms found in the same statute. This is particularly true here where title 49 uses the words "qualified," "eligible," and their variants interchangeably. *Compare* Utah Code Ann.

§ 49–11–401(3)(c) (Supp.2005) (instructing the board to regulate how service credits should "be credited toward *qualification* for retirement" (emphasis added)), *and id.* § 49–11–403(1)(c) (providing that an employee may purchase service credits based on out-of-state public employment where she "does not *qualify* for any retirement benefits based on the employment" (emphasis added)), *with id.* § 49–11–404(2)(d) (2002) (basing cost-of-living increase factor "on the date the member is *eligible* to receive benefits under a benefit protection contract" (emphasis added)). Therefore, while Justice Nehring concludes that the legislature used the word "qualify" rather than the phrase "be eligible" in pre–2004 iterations of the statute for the sole purpose of signaling that "eligible" means less than "legally qualified," I cannot make that inferential leap.

¶ 74 More fundamentally, Justice Nehring defines "eligible" as "able to choose." But the prevailing definition of "eligible" is "qualified to be chosen." *Merriam–Webster's Collegiate Dictionary* 374 (10th ed.1998). If we insert this definition into the 2004 statute, it reads, "An agency may offer the [Option Program] to an employee who is [qualified to be chosen] to receive retirement benefits." Because the State may not require an employee to receive retirement benefits before the employee fulfills all the requirements of Utah Code section 49–12–401, including filing an application to retire, Justice Nehring's interpretation is unavailing. In other words, the State may not require that an employee actually receive retirement benefits before the employee has applied for retirement.

¶ 75 In addition to relying on prior versions of the statute, Justice Nehring relies on legislative history for the proposition that the 2004 amendment was not intended to make any substantive changes to the Option Program. But in the absence of ambiguity, reliance on legislative history is improper. And if the legislative history of the 2004 statute truly indicates no intent to make substantive changes to the Option Program, it is patently unreliable because plaintiffs' only claim arises as a result of a substantive change

wrought by the 2004 amendment.[2] Thus, Justice Nehring's conclusion that the phrase "qualify for the program" is functionally equivalent to the phrase "in accordance with Title 49" in the 2004 statute has no basis. Indeed, it is not unreasonable to conclude that the reference to title 49 in the 2004 statute was intended to codify the pre–2004 regulation providing that "the decision to participate [in the Option Program] shall be made at retirement." Utah Admin. Code r.477–7–6(b) (2000).

¶ 76 Justice Nehring also relies on other provisions of title 49. But none of these provisions establish the meaning of the phrase "eligible to receive retirement benefits." For example, Justice Nehring points to the definition of "retirement" contained in Utah Code section 49–11–102(34) (Supp. 2005). It defines "retirement" as the status of an individual who has "become eligible, applies for, and is entitled to receive an allowance." Because eligibility to receive an allowance is only one of three components of "retirement," Justice Nehring concludes that eligibility to receive retirement benefits must refer to a status distinct from retirement. I disagree because the other two components of retirement (becoming eligible to apply for retirement and filing a retirement application) are conditions that must necessarily be fulfilled before one is eligible to receive an allowance. Thus, the definition of "retirement" may, in fact, be coextensive with the final act necessary to effectuate retirement—eligibility to receive retirement benefits.[3]

¶ 77 In summary, I believe that the only way to read section 67–19–14.2 consistently with title 49 is to give "retirement benefits" the same meaning as "allowance." Therefore, section 67–19–14.2 grants authority to an agency to offer the Option Program to only those employees who have (1) ceased actual work, (2) submitted an application to retire, and (3) attained the requisite age and accumulated the requisite number of service credits. Given this construction of the statute, no public employee could have obtained a vested right in the Option Program prior to submitting an application to retire. In the absence of any vested rights, H.B. 213 cannot effect a taking.

## III. ASSUMING AN AMBIGUITY IN THE STATUTE, APPLICABLE CANONS OF STATUTORY CONSTRUCTION DICTATE THE SAME RESULT

¶ 78 Were I to assume the ambiguity of the statute for argument's sake, I would nevertheless reject plaintiffs' contention that the statute endowed employees with a vested right to exchange 100% of their accrued sick leave for health insurance. I reach this conclusion on the basis of the statutory history of the Option Program, the implementing regulations, and what I believe to be the applicable canon of statutory construction.

¶ 79 There is a "well-established presumption" that "absent some clear indication that the legislature intends to bind itself contractually, . . . 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'" *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465–66, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985) (citation omitted). In other words, when it is unclear whether a legislature intends to bind itself, a court should not infer such an intent. *Cf. id.* Because section 67–19–14.2 lacks a

---

**2.** In actuality, the legislative history indicates that the legislature's intent was to conform the statute to agency practice. Audio recording: Senate Debate of H. B. 11, 55th Leg. Gen. Sess. (Feb. 26, 2004) *available at* http://le.utah.gov/asp/audio/index.asp?Sess=2004GS & Bill=HB0011 & Day=0 & House=S ("[The 2004 amendment] codifies existing procedure . . . and the existing way that we use unused sick leave.").

**3.** Justice Nehring also invokes sections 49–12–701 and 49–11–103(2). Neither applies. While section 49–11–103(2) suggests that title 49 should

be liberally construed to provide maximum benefits, it does not go so far as to suggest that it may be invoked to create an ambiguity or to countenance a construction inconsistent with the statutory language. It is also questionable whether it even applies at all to our attempt to construe the provisions the 2004 statute, which is found in a different title of the Utah Code.

Section 49–12–701 is equally inapplicable. That section governed an early retirement program that has not been available since 1988. Its value in aiding our interpretation of the 2004 statute is therefore suspect.

"clear indication" that "the legislature intend[ed]" to bestow on state employees an irrevocable and unalterable property right to exchange 100% of their banked sick leave for health insurance, I would decline to find such a right.

¶ 80 This conclusion is not only mandated by the applicable canon of statutory construction, it is consistent with the legislative intent. As described in the lead opinion, the various changes in the Option Program from 1979 to 2004 demonstrate that the legislature intended to reserve its ability to modify the menu of available benefits. The changes in the program since its inception are, in fact, persuasive evidence that the legislature did not intend to bind the State to forever redeem 100% of accrued sick leave for health insurance benefits.

¶ 81 This conclusion is also consistent with the interpretation of the statute adopted by the Director of Human Resource Management in the applicable regulations. We previously have recognized that an agency's interpretation of a statute it administers may be given some weight. *See McKnight v. State Land Bd.*, 14 Utah 2d 238, 381 P.2d 726, 731 (1963). In this case, the director has effectively interpreted the provision at issue by promulgating rules that explicitly allow an agency to offer the Option Program to an employee only "[u]pon retirement." Utah Admin. Code r.477–7–6 (2005). And the regulations also provide that state agencies may opt in and out of the Option Program on an annual basis, a provision that is wholly inconsistent with the claim of a vested contractual right at any point prior to an employee's election to retire. *See id.* Inasmuch as the regulatory interpretation is abundantly reasonable and consistent with the statutory language, I believe it should be given considerable weight.

## CONCLUSION

¶ 82 Although I agree with the result reached by the majority, my reasoning differs. I conclude that both a plain meaning analysis and an analysis that assumes ambiguity lead to the conclusion that the 2004 statute empowered agencies to offer the Option Program to employees only upon retirement. Because the offer to participate in the Option Program could not be made until an employee elected to retire, plaintiffs have no vested contractual right to exchange 100% of their accrued sick leave for health insurance.

NEHRING, Justice, concurring:

¶ 83 I join Justice Wilkins's review of the statutory and procedural background of this case and note in particular my agreement with his cautionary remarks about perceived attempts to intrude on the constitutional obligations of this court to be the independent voice of the rule of law under our form of government. I also agree with Justice Wilkins that the plaintiffs have standing to bring their facial challenge to H.B. 213 and that their facial challenge fails. I therefore concur in the analysis of Part I and in the result of Part II(1), as well as with its conclusion that the language concerning the meaning of "eligibility to receive retirement benefits" in H.B. 213's predecessor statute is ambiguous.

¶ 84 Like Justice Parrish, I conclude that the statute that H.B. 213 supplanted survives facial attack on the strength of the presumption that the legislature cannot be bound unless it manifests a clear intention to create or vest a private property right. I find it unnecessary, however, to set out on a trek into the uncharted terrain of extrinsic evidence in the hope of resolving the ambiguity that infests the 2004 amendment to section 67–19–14.2, nor would I reach the question of whether the State undertook a voluntary obligation.

¶ 85 Although the lead opinion makes a persuasive case for the ambiguity of section 67–19–14.2, the close textual exegesis offered by Justice Parrish to defend her view that the statute plainly and unambiguously conditions "eligibility to receive retirement benefits" on actual retirement compels me to respond with a text-based analysis of my own that reaches the contrary result.

¶ 86 The portion of the text of the 2004 version of section 67–19–14.2 that bears on the question of whether the statute created a property right in the Option reads as follows:

> (1) (a) There is created the "Unused Sick Leave Retirement Option Program."

(b) An agency may offer the Unused Sick Leave Retirement Option Program to an employee who is eligible to receive retirement benefits in accordance with Title 49, Utah State Retirement and Insurance Benefit Act.

Utah Code Ann. § 67–19–14.2(1)(a)-(b) (2004).

¶ 87 According to Justice Parrish, this provision cannot create a property right in the Option because an agency that chooses to adopt the Option program does not offer it to an employee until the employee has retired. This is not, of course, an interpretation that can be harvested from the plain language of the statute. An "employee who is eligible to receive retirement benefits" to whom the employer agency offers the Option need not necessarily be an employee who has retired. Indeed, it is plausible, and in my view probable, that the phrase is meant both to disqualify employees excluded or exempted from participation in one of the State's retirement systems, such as temporary employees, *see, e.g.,* Utah Code Ann. § 49–12–203 (2002), and to make the offer available to employees who have satisfied the age and service requirements for retirement but who have not yet retired.

¶ 88 The contention that the Option cannot be offered to an employee until the employee has retired must derive from the phrase "in accordance with Title 49, Utah State Retirement and Insurance Benefit Act." Utah Code Ann. § 67–19–14.2(1)(b). In the interpretation urged on us by the State, and in large measure adopted by Justice Parrish, the clause "in accordance with" that links the phrase "an employee who is eligible to receive benefits" with "Title 49" means that Title 49 should be canvassed for a provision that offers a supplemental definition for just who "an employee who is eligible to receive benefits" might be. The State and Justice Parrish contend that this defining language appears in section 49-12-401, which details the status of an employee who "is qualified to receive an allowance from this system." They reason that such an employee is the same employee described as one "who is eligible to

receive retirement benefits" in section 67-19-14.2(1)(b). Since the employee described in section 49-12-401 must have satisfied both the age and service conditions for retirement <u>and</u> formally applied to retire, formal retirement must be imparted into section 67-19-14.2(1)(b) as a condition precedent to becoming an offeree of the Option. Two fundamental flaws undermine this reasoning.

¶ 89 First, the premise that the reference to Title 49 in section 67–19–14.2(1)(b) inevitably compels the importation of the restrictive formal retirement requirement of section 49–12–401 is erroneous. A review of the text of the version of section 67–19–14 that the 2004 amendment modified discloses why. That iteration of the conversion options available for unused sick leave states that "[a]n employee must be eligible for retirement benefits to qualify for the program." Utah Code Ann. § 67–19–14(1)(a)(iv) (1999).

¶ 90 This is a phrase that is less susceptible to competing interpretations than its 2004 successor. It communicates the unambiguous message that if a State agency offers a program that permits agency employees to convert their unused sick leave, an employee who has met the age and service requirements for retirement but who has not yet formally retired may participate. In fact, this language likely excluded employees who had, for example, retired before the genesis of an unused sick leave conversion program in 1975.

¶ 91 The phrase "[a]n employee must be eligible for retirement benefits to qualify for this program" has enjoyed an enduring presence within section 67–19–14. It first appeared in 1983. In that year, the legislature amended the unused sick leave conversion provision to accommodate the legislature's desire to supplement the original rationale for providing employees the opportunity to convert unused sick leave into health and medical insurance, that is, the reduction of sick leave abuse, with an incentive for state employees to retire early, with the goal of controlling the growth of the state workforce.[1]   Utah Code Ann. § 67–19–14(2)(d).

---

1.   The early retirement program that was created by the 1983 amendments and which at that time

was grafted onto section 67–19–14 was disconnected from the unused sick leave provisions and

It was preserved when the statute was amended in 1998 and again in 1999. Did the 2004 amendment to section 67–19–14 result in a substantive change to pare back the class of those employees qualified to participate in the program to employees who had provided formal notice of retirement? No.

¶ 92 Neither the sponsor of the 2004 amendment nor anyone who rose in the legislature to speak to the merits of the amendment indicated that it would bring about any modification of the substance of the pre-amendment language. Yet, the State's reading of the 2004 amendment requires a dramatic interpretive shift to a meaning squarely at odds with the legislative history. This alone does not make the State's interpretation wrong. Indeed, the legislative history of the amendment would be irrelevant if it proved to be at odds with the unambiguous plain meaning of its text. The 2004 amendment can, however, be read to conform its interpretation to the plain meaning of its predecessor eligibility language acknowledging that an employee acquired a property right in her unused sick leave without the need to submit formal notice of an intent to retire.

¶ 93 The central alteration made by the 2004 amendment to the then-existing eligibility language was the replacement of the concluding phrase "to qualify for the program" with "in accordance with Title 49, Utah State Retirement and Insurance Benefit Act." The concept of eligibility is not, however, displaced by the amending language. This is important. Even if we were to limit our inspection of Title 49 to the sections cited by Justice Parrish, we would nevertheless not be free to ignore the text of section 67–19–14.2(1)(b) that expressly renders the Option available to an employee "who is *eligible* to receive retirement benefits." (emphasis added).

¶ 94 It is significant that the pre-2004 statutes contained both the words "eligible" and "qualify." These two words persist in the 2004 amendment, but in an altered context. Because "eligible" and "qualify" appear prominently in every configuration of statutes relating to retirement, we take a closer look at them. The pre-2004 phrase "[a]n employee must be eligible for retirement benefits to qualify for the program" may be broken down into two components, one assembled around "eligible," and the other around "qualify." We start with the first half of the phrase, "[a]n employee must be eligible for retirement benefits." There is no ambiguity in this phrase, and thus no occasion to turn to extrinsic sources to divine its meaning. We first observe that "eligible" is a word brimming with potential. That is, to be eligible, one may be desirable, fully capable of choosing or being chosen, but still uncommitted. Just as a bachelor is eligible to marry by choosing to do so, eligibility is defined by the ultimate choice or step a party must complete in order to realize the matter. This is why a boy who is under the legal marriage age is not yet eligible to marry—there is no decision or step that the boy can make or take to allow him to marry. So it is with the issue now before us. An employee is eligible for retirement benefits when there exists an election that she can make to start benefits flowing. Such a point could not be on the employee's first day of work—presumably there is nothing the employee could do at that point to start to receive retirement benefits. However, without more information, we cannot be certain that the new employee is ineligible to receive retirement benefits because nothing in the statute explicitly states at what point an employee can choose to begin receiving those benefits. All the pre-2004 statute told us is that an employee must be eligible to "qualify for the program."

¶ 95 The most logical interpretation of the link between "eligible" and "qualify" is that the right to *elect* to receive retirement benefits—to be eligible for those benefits—is one, but not necessarily the only, requirement to access the program.

¶ 96 Therefore, it must be established when an employee would be qualified. The best answer is found in section 49–12–401, which tells us when a member is qualified to receive a retirement allowance. In essence, this section states that someone is qualified to receive an allowance when she has accrued

recodified in Title 49. Utah Code Ann. § 49–12– 701.

a specified number of service credits and attained a certain age, and then ceased work and filled out the requisite paperwork. Therefore, one must ask, how can an employee become eligible to qualify? As discussed above, one is eligible when she can choose to effectuate the matter for which she is eligible. The only possible answer is that she is eligible to qualify when she has accrued the mandatory service credits and age, so that she can choose, at her discretion, when to complete the qualification requirements by ceasing work and filling out the retirement paperwork.

¶ 97 As mentioned above, the 2004 amendment to section 67–19–14 was not intended to effectuate any substantive changes to the statute, but merely to clarify its substance. This description of the amendment is supported by what was done to section 67–19–14.2(1)(b). There, the statute dropped "to qualify for the program" and replaced it with the language quoted above, "in accordance with Title 49, Utah State Retirement and Insurance Benefit Act." Where there may have been some initial doubt before as to where one could discover the qualifications for receiving the benefits provided by section 67–14–19, it was replaced with an explicit reference to Title 49. Of utmost importance is the fact that the term "eligible" remained in the statute while pointing to Title 49. The first line of section 49–12–401 states that "[a] member is qualified to receive an allowance from this system when," and then outlines the requirements for qualification as discussed above. The key is that although the word "qualify" was removed from the text of section 67–19–14.2, it was preserved by the reference to Title 49 which replaced it, and which begins by describing the qualification requirements. Therefore, the 2004 amendment must be read, as its predecessor read, that an agency can offer the program to an employee who is eligible to qualify for the program—in other words, to someone who has accrued the service credits and attained the age outlined by section 49–12–401, but who has yet to effectuate that eligibility by ceasing employment and filling out the retirement paperwork.

¶ 98 This understanding is enforced by a more comprehensive look at Title 49. Taken as a whole, the content of Title 49 can easily support the conclusion that an employee acquires a property interest in unused sick leave when she satisfies the age and service requirements for retirement without regard to whether she has submitted an application to retire.

¶ 99 Section 49–11–102(34) defines "retiree" as "an individual who has qualified for an allowance under this title." This definition is in complete harmony with section 49–12–401 which, in sub-parts (b) and (c), requires the submission of a formal application to retire and satisfaction of age and service requirements before "[a] member is qualified to receive an allowance from this system." Put another way, the "member" in section 49–12–401 is a "retiree" as defined in section 49–11–102(34). It is obvious that not every "employee eligible to receive retirement benefits" is a retiree, yet under the State's statutory interpretation, they must be.

¶ 100 Title 49's definition of "retirement" further exposes the weakness of relying solely on the text of section 49–12–401. Section 49–11–102(35) states that " 'Retirement' means the status of an individual who has become eligible, applies for, and is entitled to receive an allowance under this title." Under this definition, the "member" identified in section 49–12–401 who is "qualified to receive an allowance" is a "retiree" as defined in Title 49 and has also entered the realm of "retirement" because she has met the three conditions for retirement: she has become eligible for retirement, she has applied for retirement, and she is entitled to receive an allowance. It is clear from the definition of retirement that eligibility to receive retirement benefits is a status different than retirement. Because the status defined as "retirement" is achieved by complying with the requirements of section 49–12–401 to file a formal application for retirement and to satisfy the age and service standards, and because mere eligibility to receive retirement benefits satisfies but one of the three elements of "retirement," an employee must logically be capable of being eligible to receive retirement benefits without filing a formal application to retire.

¶ 101 Section 49–12–701 underscores the point that under Title 49 an employee's eligibility to receive retirement benefits does not require an employee to file a formal application to retire. Title 49 defines the eligibility for and the benefits of early retirement. Section 49–12–701(1)(a) makes early retirement available if "the member is eligible for retirement under Section 49–12–401, or has 25 years of service credit." The only reasonable interpretation of this provision is that the right to choose to become a retiree under section 49–12–401, in other words to become "eligible" for retirement, is separate and independent from actually electing to retire and undertaking the tasks—most notably the submission of a formal application for retirement—necessary to make the employee "qualified to receive an allowance" under section 49–12–401.

¶ 102 Finally, it is unclear to me why section 49–11–103(2) should be excluded from the provisions of Title 49 that should be considered under the "in accordance" directive of section 67–19–14.2. This section states that "[Title 49] shall be liberally construed to provide maximum benefits and protections consistent with sound fiduciary and actuarial principals [sic]."

¶ 103 While I have considerable confidence in the correctness of this textual interpretation, I do not discount the legitimacy of Justice Parrish's closely reasoned approach. I therefore stop short of asserting that my interpretation has won the day and that section 67–19–14.2 should be crowned with my reading as its sole, unambiguous construction. I am, instead, content to pursue the more modest objective of reinforcing the lead opinion's claim that the statute is ambiguous.

¶ 104 Having offered up my interpretation of the statute central to this appeal, I turn to interpreting the law that governs how an ambiguous statute that purports to create a vested private property right should be evaluated when confronted by a facial challenge to its constitutionality. The key feature of this law is the policy-based principle that the legislative branch should be free to respond to the changing needs and will of the people. The law acknowledges the fundamental need for legislative flexibility and accountability

when it imposes more rigorous demands on those who would claim that the legislature has bound itself by statute to duties and obligations that may mature in the future to demonstrate with particular clarity the legislature's intent to assume such future duties.

¶ 105 Owing to the unique policy considerations that attend to commitments made by the legislature, I would end the facial-challenge inquiry into whether a statute creates a vested property right upon a finding that the statute is ambiguous. It is unnecessary and contrary to the presumption against the creation of statutorily-vested property interests to take the next step typically taken when confronted with statutory ambiguity and examine extrinsic evidence, most notably legislative history, for guidance on the intent of the statute.

¶ 106 I hasten to add that although in this instance the State is rewarded for successfully enacting a statute remarkable for its impenetrability (during the course of this appeal I have mused over how a lawyer who might have been visited by a state employee in late 2004 would have responded to her request for an opinion concerning the status of her unused sick leave), any legislative body that chooses to adopt as a strategy the notion that there is victory in opacity would, besides betraying the trust of the people, find that outside the context of a facial challenge to a statute, ambiguity would offer scant defense against the claim of a vested property right.

¶ 107 The voluntary undertaking exception to the presumption against the statutory creation of vested property rights provides parties who believe that they have sustained damage through the unconstitutional deprivation of a statutorily-conferred property right the opportunity for redress under circumstances where no statute clearly creates that right. *Buckner v. Kennard,* 2004 UT 78, 99 P.3d 842. The lead opinion suggests that such a voluntary undertaking must supplement an expressly-created statutory obligation. This does not go far enough. Correctly understood, the exception includes the use of evidence of a voluntary undertaking to resolve a statutory ambiguity that bears on the existence and scope of a claimed vested

property right. In this setting, evidence of a voluntary undertaking would be identical in its form and purpose to extrinsic evidence that we call upon routinely to aid in the resolution of statutory ambiguities. This formulation of the exception would thereby compliment my central proposition that the presence of ambiguity itself should defeat a claim that a statute has conferred a vested property right.